# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 3, 2011 Session

## DALTON REB HUGHES ET AL. v. THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE ET AL.

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Davidson County**
**No. 04C-2406     Thomas W. Brothers, Judge**

---

**No. M2008-02060-SC-R11-CV**

---

After being injured when he jumped out of the path of a front-end loader owned by a governmental entity and operated by its employee, the plaintiff filed suit, claiming that the employee either was negligent in his operation of the equipment or had acted intentionally and that the governmental entity was liable under the Governmental Tort Liability Act. The trial court entered judgment for the plaintiff against the governmental entity and the Court of Appeals affirmed. The governmental entity sought permission to appeal, arguing first that the employee had acted outside the scope of his employment and, secondly, that he had committed an assault against the plaintiff, either of which would preclude liability under the Act. Although we hold that the employee's conduct fell within the scope of his employment, his operation of the equipment constituted the intentional tort of assault rather than negligence. The governmental entity cannot, therefore, be held liable under the Act absent proof of its negligent supervision. The judgment of the Court of Appeals is reversed as to the governmental entity, and the cause is remanded to the trial court for entry of judgment against the employee.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed and Case Remanded**

GARY R. WADE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Kevin C. Klein, Andrew David McClanahan, James William Jefferson Farrar, Melissa S. Roberge, and Sue Cain, Nashville, Tennessee, for the appellants, Metropolitan Government of Nashville and Davidson County, Tennessee.

Irene Regina Haude and Michael Joseph Flanagan, Nashville, Tennessee, for the appellee, Frank Archey.

Joe Mann Haynes, Goodlettsville, Tennessee, for the appellees, Dalton Reb Hughes and Sandra Hines Hughes.

**OPINION**

On August 19, 2004, Dalton Reb Hughes (the "Plaintiff") and wife Sandra Hines Hughes filed suit under the Governmental Tort Liability Act ("GTLA"), Tenn. Code Ann. §§ 29-20-101 to -408 (2000 & Supp. 2010), against the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") and Frank Archey (the "Defendant"), an employee of the Metro Public Works Department, for injuries he sustained on Friday, October 17, 2003. The Plaintiff, who was employed by the Metro Fire Department, alleged that the Defendant, while returning his front-end loader to a Public Works facility at the end of the day, negligently revved the engine and dropped the bucket of the front-end loader to the pavement, thereby making a loud, scraping noise and causing the Plaintiff, who was walking with his back to the Defendant, to jump awkwardly over the guardrail in an attempt to get out of the way. The Plaintiff, who injured both shoulders and both knees in the fall, ultimately had rotator cuff surgery and a double knee replacement. He incurred medical bills in excess of $80,000 and missed work for which he would have received wages in the sum of approximately $23,500.

The Plaintiff later amended his complaint to alternatively allege that the Defendant had committed an intentional act, causing the Plaintiff "to believe that [the front-end loader] was a [runaway] piece of equipment," which constituted "willful and gross negligence." In response to the Plaintiff's amended complaint, Metro filed a crossclaim against the Defendant seeking to recover the lost wages and medical expenses it had paid to the Plaintiff and also seeking judgment for any further loss. Metro also filed a counterclaim against the Plaintiff asking for subrogation as to any lost wages or medical payments recovered from the Defendant.

**Trial Testimony**

At trial, the Plaintiff testified that when he was walking to his vehicle at the end of his shift, he heard the "revving of [an] engine" and saw a front-end loader as it approached him from behind at "a high rate of speed." When he looked around to determine how he would get out of the way, "the bucket dropped and made a scraping noise across the asphalt [like the driver] was almost fixing to run over us." The Plaintiff stated that he then attempted to leap over the guardrail but struck the top with his knee and somersaulted to the pavement below. He recalled that when he looked up, he saw the Defendant "sitting in the loader with a big grin on his face." When the Defendant realized that the Plaintiff was hurt, however,

he stepped off the loader and said, "I'm sorry, . . . all I meant to do was scare you, . . . I didn't mean to hurt you."[1] The Plaintiff testified to seeing the marks made by the front-end loader's bucket after the accident and described them as continuous in nature. The Plaintiff, who had known the Defendant from years earlier when the Defendant's mother babysat for his daughter, stated that he had not seen the Defendant in twenty-five or twenty-six years.

Tommy Goad, who was walking alongside the Plaintiff, testified that he heard a noise as the Defendant approached the two men from behind but did not look back because there appeared to be plenty of room for a vehicle to pass on his left; he pointed out, however, that he had not seen the front-end loader, as had the Plaintiff, before he heard a "sudden . . . different kind of sound, like something hit pavement." After glancing to his left, Goad heard the Plaintiff "hollering out" as he lay on the ground on the other side of the guardrail. He recalled the Plaintiff exclaiming, "I thought I was going to get run over!" He stated that the loader stopped at an angle in the access road only a foot or two from where the Plaintiff had been walking. According to Goad, the Defendant approached the Plaintiff and apologized, saying, "I didn't mean for you to get hurt. I was just trying to scare you."

Daryl Pulley, also a Fire Department employee, was an additional witness to the incident. He heard the engine of the front-end loader "revving up or at a higher RPM," and saw the bucket drop for some "twelve to twenty feet [to] . . . within inches [of] where [the Plaintiff's] feet would have been . . . before he went over the rail." He described the scraping sound as continuous. Pulley saw the Plaintiff have his feet "taken . . . from under him" as he disappeared on the other side of the rail. He stated that when he arrived at the scene of the accident, he observed "skid marks" or "indentations in the concrete itself . . . where metal had rubbed the pavement." Pulley described the Plaintiff as "hurting" and "noticeably shaken up" after the fall. He recalled that the Defendant parked his loader, "kind of chuckled," put his arm around the Plaintiff, and explained that he was "just trying to scare him" and "wouldn't hurt him for anything in the world."[2] Pulley remembered that the Plaintiff responded, "leave me alone, get away from me."

Pat Armstrong, a Fire Department employee who was walking with Pulley, corroborated the testimony of the witnesses testifying for the Plaintiff. He also described the scraping noise as continuous and recalled that the Defendant apologized, explaining that he "was just joking," "didn't mean to do that," and "was just trying to scare you all."

---

[1] On cross-examination, counsel for Metro asked whether it was possible that the Defendant stated "I didn't mean to scare you," to which the Plaintiff replied, "[w]ell, could have been that way, yeah."

[2] Pulley testified that on three different occasions he heard the Defendant state that he did not mean to hurt the Plaintiff and only meant to scare him.

Charles Wayne Vic, an assistant fire chief, also testified for the Plaintiff. He was leaving work when he saw several of the Fire Department employees standing around the Plaintiff. After he learned what had happened, he sought out Jerry Jones, a Public Works supervisor, who was talking to the Defendant. Vic overheard Jones say to the Defendant, "I have told you and told you about that," before he abruptly ended the conversation, realizing that Vic was within earshot.

John David Pope, an employee in the Public Works Department, testified for the Defendant, whom he described as a friend he had known for eighteen years. He recalled that on the day of the accident, he was standing some thirty yards away in the employee parking lot when he heard "a little thump on the ground" as the Defendant came through the gate to the access road and then saw the Plaintiff jump over the guardrail. He stated that there was "a little dip" in the access road that caused the loader to "kind of bounce." However, Pope, who had operated a front-end loader on several occasions, acknowledged that he had never made such a noise while driving on that part of the access road. He also admitted that he was not in a position to hear any of the conversation that subsequently took place between the Plaintiff and the Defendant.

The Defendant, who was employed as a heavy equipment operator, had operated the front-end loader for some fifteen to sixteen years by the time of trial in 2008. He had for years regularly driven the access road as he returned to the Public Works facility, and he testified that a guardrail had been added to the road when the fire department moved in two or three weeks prior to the accident. The Defendant recalled that as he drove on to the access road off of Charlotte Avenue, his speed was between six and eight miles per hour and he was operating the vehicle in first gear, "wide open, throttle hold to the floor," which would allow the machine to go up to a maximum speed of eight miles an hour. While acknowledging that he was familiar with the road and "revving it up pretty good," he claimed that when he saw two individuals, whom he was able to later identify as the Plaintiff and Goad, walking by the guardrail to his right, he moved to the left side of the road. He stated that he was thirty to thirty-five yards away from the Plaintiff. The Defendant explained that when he hit a dip, his bucket, which was set at "bottom-out status" or about three to nine inches off the ground, struck the pavement and "bounced up and hit and bounced up again" two or three times. He testified that he did not know the identity of the individual who had jumped over the guardrail until he "drove up beside him."

The Defendant, who insisted that he was not engaging in horseplay, denied saying anything to the Plaintiff like, "I was just messing with you." He testified that when he stopped his vehicle, he asked the Plaintiff if he was okay and explained that he did not intend to scare him. He claimed that he smiled only when the Plaintiff cursed him. The Defendant also denied that his supervisor had cautioned him about his behavior immediately after the

-4-

incident, but did admit that he was suspended for a day without pay and lost some other benefits as a result of his conduct. He maintained that Jerry Jones was not at the Public Works facility on the day of the accident, implying that Vic was mistaken in his testimony. He also testified that he saw Goad a few days after the incident and informed him that he did not intend to hurt or frighten the Plaintiff. The Defendant stated that he and the Plaintiff had always maintained a friendly relationship and that some twenty-five years earlier, the Plaintiff lived less than a quarter-mile away from him and occasionally took him to truck pulls and car shows.

During cross-examination, the Defendant conceded that he had earned low marks in the safety category during an evaluation. He also admitted having received a "not acceptable" rating on attendance, observance of work hours, and compliance with the rules. The Defendant insisted, however, that he had intended neither to scare nor to hurt the Plaintiff and claimed that he had applied his brakes and slowed the loader by about two miles per hour as he approached the Plaintiff and Goad. When asked by the Plaintiff's counsel why he had not mentioned slowing down in his deposition, the Defendant claimed that it was because he had not been asked the question. He admitted that the access road was about nineteen feet wide and the bucket on the front-end loader approximately eight feet, five inches in width, giving him "over [ten] feet to spare" if he were over in the left lane. When questioned by counsel as to why the marks on the asphalt were in the middle and to the right of the road, as opposed to the left, the Defendant contended that he was attempting to avoid not only the Plaintiff and Goad, who were on the right side of the road, but several people who were on the left side of it, a claim that he had failed to make in a prior statement. The Defendant described the incident as entirely accidental.

At the conclusion of the proof, the trial court first found that Metro was not guilty of negligently supervising the Defendant. Secondly, the trial court determined that the Defendant was acting within the scope of his employment at the time the incident occurred, that he had breached his duty of care, and that his conduct had caused the Plaintiff's injuries: "He was aware of the dip" in the road and, "[n]onetheless, he approached it without slowing down." The trial court made further findings as to the intent of the Defendant as it related to the GTLA:

> [I]t [is] clear to me that Mr. Archey intended to carelessly drive this vehicle over that little bump, making the noise and commotion that was going to be associated with it.
>
> The fact that he intended to drive the vehicle in a negligent or careless manner does not morph this into the classic intentional tort of assault. And it conceivably could be argued that it [is] reckless, but I don't think that

recklessness is included by this statute. . . . [a]nd it seems clear to me that <u>even</u> <u>finding that Mr. Archey intended to be careless and was even reckless in what</u> <u>he was doing to make this noise</u>, to make a commotion as he came up behind these pedestrians, not knowing who it was, <u>I think it [is] clear, too, he didn't</u> <u>know who was walking in front of him, he is still covered by this section of the</u> <u>statute and immunity is removed and Metropolitan Government is responsible.</u>

. . . .

[The Defendant] <u>intended to do this. And I think I know what [is]</u> <u>going on. It [is] Friday afternoon, and from Mr. Archey's testimony, I get a</u> <u>taste of his personality, and they use the term horseplay and cutting up</u> and he was going to do something very foolish and cut up as he was coming through there and rev up his front[-]end loader and bounce it through this little spot and make a lot of noise. . . . [I]t seems as though the noise and the actions of Mr. Archey really took place several feet, at least, behind where [the Plaintiff and Goad] were walking. It [is] still noisy enough that everybody in the whole area could hear what was going on . . . . [I]t is foreseeable that by causing that type of noise and commotion, that somebody might be startled, frightened, shocked, . . . trip, and be hurt. For that reason the negligent person is responsible for it.

(Emphasis added).

Because the trial court concluded that the Defendant was acting within the scope of his employment, it determined that he was immune from suit and that Metro was "responsible as the principal for the servant's actions" under the GTLA.[3] The trial court found that the Plaintiff had "incurred damages and injuries that actually . . . exceed[ed]" the statutory cap and held Metro liable for $250,000. The court determined, however, that Metro was entitled to a set-off in the amount of $104,000 for payments it had made up to that point. Counsel for Metro then specifically asked for a clarification as to the trial court's "factual determination as to whether [the Defendant] intended to come through . . . and make noise and intended to come through there and scare" the pedestrians on the access road. In response, the trial court observed

that [the Defendant] intended to operate the vehicle carelessly in such a manner as to make . . . noise as he came over that dip and crash the bucket. .

---

[3] The GTLA immunizes a governmental employee when the governmental entity is liable; however, the immunity afforded governmental entities does not extend to the employee. <u>Fann v. City of Fairview</u>, 905 S.W.2d 167, 174 (Tenn. Ct. App. 1994).

. . [I]f he was trying to ram into [the Plaintiff], I think that's a different situation because then it's not negligence by any stretch of the imagination. It's an intent to cause harm. . . . That's an intentional action that I think is different and apart from negligent operation.

Although the Court of Appeals affirmed the judgment, it ruled that the trial court had erroneously interpreted section 29-20-202 of the GTLA when it held that the section did not require a finding of negligent conduct and observed that if the General Assembly

had wanted to change that and say except if somebody is operating it intentionally or recklessly or grossly negligent or wanted to add[] any type of exception to it, I presume that they would have done so. They intended to cover every operation of motor vehicles and equipment by government employees as . . . having immunity removed.

Hughes v. Metro. Gov't of Nashville & Davidson Cnty., No. M2008-02060-COA-R3-CV, 2010 WL 424240, at *11 (Tenn. Ct. App. Feb. 4, 2010). The trial court had further stated

that even finding that [the Defendant] intended to be careless and was even reckless in what he was doing to make this noise, to make a commotion as he came up behind these pedestrians, not knowing who it was, . . . he is still covered by this section of the statute and immunity is removed and Metropolitan Government is responsible.

The Court of Appeals, while ruling that the trial court had erred in this latter observation because immunity was removed only upon proof of negligent conduct, pointed out that the Plaintiff was not entitled to recovery under the GTLA if the Defendant had acted intentionally. Id. Although Metro contended on appeal that the Defendant had intended to frighten the Plaintiff, thereby committing an intentional assault, the Court of Appeals held that the mere intent to frighten, in contrast to the intent to harm, did not qualify as an intentional tort and fell into the broader category of negligence. See id. at *13-14.

This Court granted the application for permission to appeal in order to determine first whether the Defendant's conduct was within the scope of his employment with Metro, a statutory prerequisite to governmental liability, and if so, whether the intent to frighten qualified as a negligent act, thereby permitting the Plaintiff to recover from Metro under the terms of the GTLA.

**Standard of Review**

In a civil case heard without a jury, the trial court's findings of fact are presumed to

be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); Blackburn v. Blackburn, 270 S.W.3d 42, 47 (Tenn. 2008); Langschmidt v. Langschmidt, 81 S.W.3d 741, 744 (Tenn. 2002). When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. Estate of Walton v. Young, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting Randolph v. Randolph, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. Wells v. Bd. of Regents, 9 S.W.3d 779, 783 (Tenn. 1999). Questions of law are subject to de novo review with no presumption of correctness. Graham v. Caples, 325 S.W.3d 578, 581 (Tenn. 2010); Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (citing Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003)).

## Analysis
### I. Sovereign Immunity

"[D]eeply rooted in feudal notions of the divine right of kings," sovereign immunity, which protects the state and its political subdivisions from tort liability, is based upon the premise that "the King can do no wrong." Cooper v. Rutherford Cnty., 531 S.W.2d 783, 786 (Tenn. 1975) (Henry, J., dissenting).[4] The doctrine has been a part of Tennessee jurisprudence for well over one hundred years. See, e.g., State v. Bank of Tenn., 62 Tenn. 395, 402 (1874); Memphis v. Kimbrough, 59 Tenn. (12 Heisk.) 133, 135-36 (1873). Nevertheless, our state constitution has empowered our legislature to waive the protections of sovereign immunity: "Suits may be brought against the State in such manner and in such courts as the Legislature may by law direct." Tenn. Const. art. I, § 17; see also Hawks v. City of Westmoreland, 960 S.W.2d 10, 14 (Tenn. 1997). The state, therefore, must specifically consent to suit before being subjected to liability. Cruse v. City of Columbia, 922 S.W.2d 492, 495 (Tenn. 1996); see also Lucius v. City of Memphis, 925 S.W.2d 522, 525 (Tenn. 1996).

In 1973, following the lead of other states that had abolished or limited sovereign immunity by statute or judicial decision, our General Assembly passed the Tennessee Governmental Tort Liability Act, ch. 345, 1973 Tenn. Pub. Acts 1243. The GTLA retained the viability of sovereign immunity, but, in what has been described as "an act of grace," removed the exemption of state and local governments from tort liability in limited circumstances. Kirby v. Macon Cnty., 892 S.W.2d 403, 406 (Tenn. 1994). In pertinent part,

---

[4] Years ago, Justice Henry criticized governmental immunity as "a cankered, corroded and corrupted area of our law" and "the flaming sword used by cities and counties in Tennessee to banish the innocent victims of their wrongs and deny them their traditional day in court." Id. at 785.

-8-

the GTLA provided that "[e]xcept as may be otherwise provided in this chapter, all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions." Tenn. Code Ann. § 29-20-201(a). One of these exceptions is for injuries occurring as a result of the negligent operation of equipment: "Immunity from suit of all governmental entities is removed for injuries resulting from the negligent operation by any employee of a motor vehicle or other equipment while in the scope of employment." Tenn. Code Ann. § 29-20-202(a). Any award against a governmental entity may not, however, "exceed the minimum amounts of insurance coverage . . . specified in § 29-20-403, unless such governmental entity has secured insurance coverage in excess of such minimum requirements, in which event the judgment or award may not exceed the applicable limits provided in the insurance policy." Tenn. Code Ann. § 29-20-311.

The GTLA's waiver of immunity is "narrowly confined in its scope." Doyle v. Frost, 49 S.W.3d 853, 858 (Tenn. 2001). "[S]tatutes which waive immunity of the [governmental entity] from suit are to be construed strictly in favor of the sovereign."[5] McMahon v. United States, 342 U.S. 25, 27 (1951). The Act provides that "any claim for damages must be brought in strict compliance with the terms of this chapter." Tenn. Code Ann. § 29-20-201(c). In Ezell v. Cockrell, 902 S.W.2d 394 (Tenn. 1995), this Court confirmed that the GTLA, as a statute in derogation of the common law, must "be strictly construed and confined to [its] express terms, and that rule of construction has been expressly incorporated into the Act." Id. at 399 (citation omitted).

## II. Scope of Employment

Both of the relevant provisions of the GTLA waiving Metro's immunity and subjecting it to liability require the Defendant's operation of the front-end loader to have been within the scope of his employment. See Tenn. Code Ann. §§ 29-20-202(a) & -205. Whether an employee is acting within the scope of his or her employment is a question of fact. Home Stores, Inc. v. Parker, 166 S.W.2d 619, 622 (Tenn. 1942); Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co., 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992) (observing that the determination as to whether an act occurred within the scope of employment "requires the weighing and balancing of the facts and circumstances of each case"); Restatement (Second) of Agency § 229 cmt. a (1958) ("The limits of the scope of

---

[5] Conversely, the Tennessee Workers' Compensation Act is to be "liberally construed in favor of compensation and any doubts should be resolved in the employee's favor." Wait v. Travelers Indem. Co. of Ill., 240 S.W.3d 220, 224 (Tenn. 2007); see also Tenn. Code Ann. § 50-6-116 (2008).

employment are dependent upon the facts of the particular case[.]").[6]  In the case before us, the Court of Appeals recognized that the trial court's determination that the Defendant had acted within the scope of his employment was entitled to a presumption of correctness and held that his conduct was "in the general course of carrying out [Metro's] business so as to be within the scope of his employment."  Hughes, 2010 WL 424240, at *11 (citation omitted).

Metro, however, relying on Terrett v. Wray, 105 S.W.2d 93 (Tenn. 1937), argues that the trial court's findings of fact actually demonstrated that the Defendant had acted outside the scope of his employment, pointing out that "[e]xtraordinary, extreme, or prankish acts rarely can be attributed to the master."  Id. at 94.  In Terrett, decided almost seventy-five years ago, and well before the passage of the GTLA, this Court made the following general observations:

> The act of the servant, to make the master liable, must be within the course of the employment [] he is doing for the master, either the main act itself or some other act which can fairly and reasonably be deemed to be a proper means of doing the main act, or an ordinary and natural incident or a natural, direct, and logical result of it.
>
> . . . .
>
> [W]hen the servant or agent, aside from the scope of employment, does an act, having no causal relation between the service to be rendered and the injury sustained by the plaintiff, the defendant is not to be held responsible for the resulting injury.

Id.[7]  The Plaintiff argues that Terrett is distinguishable on its facts because the tortfeasor's

---

[6] While acknowledging that the question of whether an employee was acting within the scope of employment becomes one "of law when the facts are undisputed and cannot support conflicting conclusions," as held in Tennessee Farmers Mutual Insurance Co., 840 S.W.2d at 937, here the Court of Appeals concluded that "the parties do not agree as to whether [the Defendant] was 'horseplaying' during the incident or whether his front[-]end loader merely 'bottomed out' due to the dip in the access roadway," and properly classified the question as one of fact entitled to the presumption of correctness on appeal.  Hughes, 2010 WL 424240, at *10 (internal quotation marks and citations omitted).

[7] In Terrett, a mother instructed her son to drive her automobile to a location to pick up his siblings. 105 S.W.3d at 93.  The son connected a wire from the battery to one of the car door handles, and, on his way home, offered Evans Terrett, the plaintiff, a ride home; Terrett, who was injured when he touched the door handle and received a shock, sued the mother for his injuries, as she had allowed her son to use the family
(continued...)

-10-

actions in that case were so "far removed from the purpose for which he was authorized," whereas here, the Defendant was operating the front loader as part of his employment, and his actions "were more akin to honking the horn of a car to startle someone." Similarly, the Defendant argues that because he was driving along the route prescribed by Metro for the purpose of storing the equipment in its facilities, Terrett has little application to these facts.

Because the incident at issue occurred while the Defendant was operating a vehicle owned by Metro, this Court must also consider Tennessee Code Annotated section 55-10-311(a) (2008), which provides as follows:

> In all actions for injury to persons . . . caused by the negligent operation or use of any automobile, auto truck, motorcycle, or other motor propelled vehicle within this state, proof of ownership of the vehicle shall be prima facie evidence that the vehicle at the time of the cause of action sued on was . . . then and there being operated by the owner, or by the owner's servant, for the owner's use and benefit and within the course and scope of the servant's employment. . . .

(Emphasis added). A prima facie case established pursuant to this statutory provision may be overcome by the uncontradicted evidence of a credible witness. See Russell v. City of Memphis, 106 S.W.3d 655 (Tenn. Ct. App. 2002); cf. Downs ex rel. Downs v. Bush, 263 S.W.3d 812, 825 (Tenn. 2008) ("The owner may overcome this prima facie case with countervailing evidence 'that the driver was in fact operating the vehicle without authority of the owner.'" (quoting Ferguson v. Tomerlin, 656 S.W.2d 378, 381-82 (Tenn. Ct. App. 1983))). In Russell, our Court of Appeals found that the prima facie case established by the City of Memphis' ownership of the vehicle operated by the defendant, a City employee who was on-call at the time of the accident, was overcome by evidence that he "was using the City's vehicle to run personal errands and had consumed alcoholic beverages earlier in the day." 106 S.W.3d at 656-57. Similarly, in Thurmon v. Sellers, 62 S.W.3d 145, 153 (Tenn. Ct. App. 2001), the Court of Appeals found that the prima facie case established by section 55-10-311(a) was overcome, despite the fact that the vehicle the employee was driving when he collided with another vehicle was leased by his employer. Id. at 150. The employee and one of his passengers testified that the purpose of the trip was to shop for golf clubs. Id. at 153. At no point during the excursion did the employee stop at his place of employment

---

[7](...continued)
vehicle. This Court found helpful the use of the above-quoted "general principles governing the liability of master for the acts of his servant, or of the principal for the acts of the agent," id. at 94, and ultimately concluded that, based on the prankish nature of the son's act, there was no reason "to hold the ordinary owner of an automobile [liable] for the separate tort of a son while using the car for the mother." Id. at 95.

before going about personal business.  Id.  While both of these cases are factually distinguishable because they involve automobiles, as opposed to the heavy machinery at issue here, they illustrate the nature of the evidence required to effectively rebut a prima facie case established under the statute that an act was in the scope of employment.

"Scope of employment" is undefined in the GTLA.  Because we must presume that the General Assembly "kn[e]w the state of the law on the subject under consideration at the time" of the GTLA's enactment, cf. In re Estate of Davis, 308 S.W.3d 832, 842 (Tenn. 2010) (citation omitted), it is appropriate for this Court to look to the common-law doctrine of respondeat superior to determine the meaning of "scope of employment" for purposes of the GTLA.  See, e.g., Russell, 106 S.W.3d at 657 (utilizing doctrine to determine if city employee, who killed plaintiff while driving a city-owned vehicle, was acting within the scope of his employment for purposes of the GTLA); cf. Washington v. Robertson Cnty., 29 S.W.3d 466, 475-76 (Tenn. 2000) (determining that the doctrine of respondeat superior should be used to determine whether an employee is acting within the scope of employment for purposes of the Tennessee Human Rights Act).  Pursuant to this doctrine, "an employer may be held liable for the torts committed by his or her employees while performing duties within the scope of employment."  White v. Revco Disc. Drug Ctrs., Inc., 33 S.W.3d 713, 718 (Tenn. 2000); see also 2 Dan B. Dobbs, The Law of Torts § 333 (2001).  In respondeat superior cases, our courts have typically sought guidance from the Restatement of Agency in determining whether an act was within the scope of employment in a particular case.  See, e.g., Kelly v. La. Oil Refining Co., 66 S.W.2d 997, 998 (Tenn. 1934); Tenn. Farmers Mut. Ins. Co., 840 S.W.2d at 937 ("The courts have frequently turned to the Restatement (Second) of Agency for the theoretical framework for deciding whether an employee's conduct is within the scope of his or her employment.").

Our Court of Appeals noted that it had previously cited with approval the Restatement (Second) of Agency.  Hughes, 2010 WL 424240, at *9 (citing Morris v. Collis Foods, Inc., No. W2001-00918-COA-R3-CV, 2002 WL 1349514, at *1 (Tenn. Ct. App. June 19, 2002)).  The Restatement (Second) provides the following test for determining whether an act was within the scope of employment:

> (1) Conduct of the servant is within the scope of employment if, but only if:
>      (a) it is of the kind he is employed to perform;
>      (b) it occurs substantially within the authorized time and space limits;
>      (c) it is actuated, at least in part, by a purpose to serve the master; and
>      (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of the servant is not within the scope of employment if it is

-12-

different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228. The Court of Appeals also listed as helpful the factors identified in section 229(2) of the Restatement (Second) of Agency:

(2) In determining whether or not the conduct although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
(a) whether or not the act is one commonly done by such servants;
(b) the time, place and purpose of the act;
(c) the previous relations between the master and the servant;
(d) the extent to which the business of the master is apportioned between different servants;
(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
(f) whether or not the master has reason to expect such an act will be done;
(g) the similarity in quality of the act done to the act authorized;
(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
(i) the extent of departure from the normal method of accomplishing an authorized result; and
(j) whether or not the act is seriously criminal.

Some other jurisdictions have explicitly adopted the Restatement (Second) of Agency as the test for determining whether an employee was acting within the scope of employment,[8] while others merely use it as a guide in the analysis.[9]

---

[8] See, e.g., Moseley v. Second New St. Paul Baptist Church, 534 A.2d 346, 348 n.4 (D.C. 1987) (noting that the scope of employment test contained in the Restatement (Second) section 228 had previously been adopted by the court); Bagent v. Blessing Care Corp., 862 N.E.2d 985, 992 (Ill. 2007) (holding that all three criteria in section 228 of the Restatement (Second) must be met in order to conclude that an employee is acting within the scope of employment); Grager v. Schudar, 2009 ND 140, ¶ 23, 770 N.W.2d 692, 699 (N.D. 2009) (observing that the scope of employment determination requires consideration of each element in section 228).

[9] See, e.g., Ondrusek v. Murphy, 120 P.3d 1053, 1057 (Alaska 2005); State v. Schallock, 941 P.2d

(continued...)

Recently, the Restatement of Agency was revised to offer more general guidance on the issue:

> An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

Restatement (Third) of Agency § 7.07(2) (2006). Metro argues that under the Restatement (Third) of Agency, "the employee's intent is squarely at issue when determining whether the employee was acting within the scope of his or her employment," and because the Defendant intended to frighten the Plaintiff in his operation of the front-end loader,[10] "he embarked upon 'an independent course of conduct not intended by the employee to serve any purpose of'" Metro. In response, the Plaintiff asserts that the Defendant's "primary motivation" was to serve Metro, and that he was not "engaged in a completely independent course of conduct with no relation to any purpose" of his employer.

Although this Court has not had the opportunity to address the Restatement (Third) of Agency, courts in other states have done so. Two jurisdictions have expressed approval. See Barnett v. Clark, 889 N.E.2d 281, 284 (Ind. 2008) (utilizing the Restatement (Third) in vicarious liability analysis); Patterson v. Blair, 172 S.W.3d 361, 369 (Ky. 2005) (determining that, in the context of vicarious liability for intentional torts, the tentative draft of the Restatement (Third) emphasizes the intent of the employee, which comports with Kentucky case law on the matter). Other courts, however, have declined to adopt the standard. See Picher v. Roman Catholic Bishop of Portland, 2009 ME 67, ¶ 32, 974 A.2d 286, 296 (noting that the Restatement (Third) has replaced the Restatement (Second), but "express[ing] no opinion as to [the latter's] applicability . . . to the facts of this case, except to say that on remand, the court may look to [the Restatement (Third)] to provide the appropriate

---

[9](...continued)
1275, 1282-84 (Ariz. 1997); Draper v. Olivere Paving & Constr. Co., 181 A.2d 565, 570 (Del. 1962); Akins v. Golden Triangle Planning & Dev. Dist., Inc., 2009-CA-00182-SCT (¶ 23) (Miss. 2010); Carter v. Reynolds, 815 A.2d 460, 465-66 (N.J. 2003); Kirlin v. Halverson, 2008 SD 107, ¶¶ 17-19, 758 N.W.2d 436, 445-46; Clark v. Pangan, 2000 UT 37, ¶ 23, 998 P.2d 268, 273; Robel v. Roundup Corp., 59 P.3d 611, 621 (Wash. 2002); Olson v. Connerly, 457 N.W.2d 479, 483-84 (Wis. 1990).

[10] Both the Plaintiff and the Defendant argue in their respective briefs that the lower courts did not find that there was an actual intent to frighten the Plaintiff.

framework for analyzing the vicarious liability issues");[11] <u>Melin-Schilling v. Imm</u>, 205 P.3d 905, 908 (Wash. Ct. App. 2009) (observing that the Restatement (Third) has replaced the Restatement (Second), but that the newer version is largely consistent with the older one); <u>see also</u> <u>Kirlin</u>, 2008 SD 107, ¶ 65, 758 N.W.2d at 456 (Meierhenry, J., concurring) ("Although we still adhere to th[e test in the Restatement (Second) of Agency § 228], we should perhaps consider the approach adopted by the Restatement (Third) of Agency in the future.").

The Restatement (Third) of Agency provides a simplified approach to the "scope of employment" question and serves to modernize some of the terminology, replacing, for instance, "master" and "servant" with "employer" and "employee." <u>Compare</u> Restatement (Third) of Agency § 7.07(1)-(2) <u>with</u> Restatement (Second) of Agency § 228(1)-(2). The Restatement (Second) of Agency, however, particularly the list of factors contained in section 229(2), provides a more instructive framework for an analysis that is ultimately "dependent upon the facts of the particular case." Restatement (Second) of Agency § 229 cmt. a. In our view, the Court of Appeals appropriately used the Restatement (Second) as part of its analysis. <u>See</u> <u>Hughes</u>, 2010 WL 424240, at *11 ("After a close consideration of the circumstances and the above-cited authorities, we find that the evidence presented does not preponderate against the trial court's finding that [the Defendant] was acting within the scope of his employment. . . .").

As stated, the Court of Appeals agreed with the trial court that the Defendant had intentionally revved up the engine on his front-end loader and had purposefully driven through the dip in the access road so as to make a loud scraping noise, but had nonetheless acted within the scope of his employment:

> [T]hat [the Defendant] had departed from Metro's rules [of safety] does not automatically remove his conduct from the scope of his employment, nor does a finding of horseplay. [The Defendant] was returning the front[-]end loader as part of his employment with Metro, his primary motivation in operating the front[-]end loader was serving Metro, he was traveling the route prescribed by Metro, and the front[-]end loader had been furnished by Metro. Although [the Defendant's] conduct in causing the loud noise which frightened [the Plaintiff] was "a personal project of his own[,]" we nonetheless find that [the Defendant's] conduct occurred . . . within the scope of his employment.

---

[11] <u>But see</u> <u>Spencer v. V.I.P., Inc.</u>, 2006 ME 120, ¶ 6, 910 A.2d 366, 367 ("In determining whether an employer is vicariously liable for the actions of an employee, Maine follows the Restatement (Second) of Agency (1958) and holds an employer liable only if its employee's action occurred within the scope of employment.").

Hughes, 2010 WL 424240, at *11 (citation omitted).[12]

Whether the conduct of an employee was within the scope of his employment is fact-intensive. While there is no bright-line rule, the several factors identified in the Restatement (Second) of Agency sections 228 and 229 provide proper guidance on the issue. Initially, the Defendant, a veteran employee of Metro, was employed to operate heavy equipment, see Restatement (Second) of Agency § 228(1)(a), and was returning the front-end loader on Metro property at the end of the day as instructed by his employer. Id. § 228(1)(b), (c). In other words, the Defendant's acts were "actuated, at least in part, by a purpose to serve" Metro, id. § 228(1)(c), in that his misguided use of the front-loader was largely bound up in his duties as a Metro employee, as opposed to a purpose that was "purely personal." See, e.g., Russell, 106 S.W.3d at 657 (holding that employee's use of city vehicle was outside the scope of employment because his purpose in using it was purely personal); Thurmon, 62 S.W.3d at 153 (holding that employee's use of the vehicle was outside the scope of employment because the trip at issue was purely personal); cf. Leeper Hardware Co. v. Kirk, 434 S.W.2d 620, 624-25 (Tenn. Ct. App. 1968) (holding that travel that serves a dual purpose of the employer and the employee may be within the scope of employment); Fitzgerald v. Wood, 238 S.W.2d 103, 105 (Tenn. Ct. App. 1950) (same). There was no use of force, in the traditional sense, by the Defendant against the Plaintiff. Id. § 228(1)(d). By driving the front-end loader so as to make

---

[12] The Court of Appeals cited United States v. Taylor, 236 F.2d 649 (6th Cir. 1956), as support for the proposition that not all horseplay is outside the scope of employment, quoting a portion of the opinion that provides as follows:

> The Tennessee courts have consistently held that failure to obey a rule as to how the master's business is to be performed does not of itself constitute a departure from the servant's scope of employment.
>
> Moreover the Tennessee Court of Appeals has recognized that an employee may remain within the scope of his employment so as to hold his employer liable for his tort even though he undertakes a personal project of his own, if it is undertaken in the general course of carrying out his employer's business.

Id. at 654 (citations omitted). In Taylor, the Sixth Circuit determined that the defendant Air Force lieutenant, who had flown three hundred miles off his prescribed training exercise course at excessive speeds and low altitudes, and had ultimately injured a person after crashing, had "completely abandoned [his employer's] business" based not only upon his "geographical deviation" but his manner of conducting the flight, which was clearly unauthorized by his superiors. Id. The court quoted Terrett for the proposition that "'[e]xtraordinary, extreme, or prankish acts rarely can be attributed to the master as means or methods of carrying out an ordinary employment.'" Id. (quoting Terrett, 105 S.W.2d at 94). As noted by the Court of Appeals, "the circumstances of the instant case present a closer question than the facts of those cases relied upon by the parties." Hughes, 2010 WL 424240, at *11.

a loud noise, he was neither "far beyond" the time and place of his employment nor too far removed from his regular duties, factors suggesting his actions could be attributed to Metro. See id. § 228(2) ("Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.").

Turning to the factors used in determining whether the acts of an employee, although not authorized, are so similar or so incidental to authorized conduct as to fall within the scope of employment, see Restatement (Second) of Agency § 229(2), we would initially observe that there was no evidence that driving a vehicle in an intimidating manner was reasonably expected by Metro. Id. § 229(2)(f). That suggests the Defendant may not have been acting within the scope of his employment. What was common, however, was that the Defendant was required to return his equipment to the Metro facility at the end of each work day. See id. § 229(2)(a). Other factors listed in the Restatement (Second) of Agency lend support to the finding by the trial court that the Defendant acted within the scope of his employment: the incident occurred during working hours along the access road that led to the Public Works facility, id. § 229(2)(b), and took place while the Defendant was operating a vehicle furnished by Metro, a task he was specially trained and directed to do. Id. § 229(2)(h). Arguably, the Defendant's manner of driving did not extensively depart from the normal method of returning the front-end loader to the Public Works facility at the end of the work day. Id. § 229(i). Finally, the Defendant's misuse of the front-end loader did not qualify as "seriously criminal," id. § 229(2)(j), as even if his operation of the equipment constituted criminal assault, such an offense would qualify as a misdemeanor rather than a felony. See Tenn. Code Ann. § 39-13-101(b)(1) (2010) (categorizing criminal assault as a Class A or B misdemeanor, depending on whether physical contact occurs). Thus, while no proof suggests that any "horseplay" by the Defendant was authorized by Metro, the offensive manner in which he operated Metro's vehicle could be properly described as incidental to his authorized duties.

While his operation of the equipment so as to cause fear in others could be characterized as "a personal project," Hughes, 2010 WL 424240, at *11, there is no evidence that the Defendant made such a departure from his duties as a Metro employee that his acts, as a whole, could be considered a venture of a "purely personal" nature. In summary, the evidence does not preponderate against the finding by the trial court, affirmed by the Court of Appeals, that the Defendant acted within the scope of his employment.

### III. Whether the Defendant's Action was Negligent or Intentional
Metro next argues that it is immune from suit because the Defendant did not negligently cause injury to the Plaintiff, but instead committed the intentional tort of assault. In response, the Plaintiff and the Defendant contend that for an action to qualify as an assault, the tortfeasor must actually intend harm, and that because the Defendant did not intend to

harm the Plaintiff and was merely engaged in "horseplay," Metro is liable under the theory of negligence, an exception to the immunity reserved by the GTLA. The trial court ruled that the Defendant, while "intend[ing] to drive the vehicle in a negligent or careless manner," did not commit the intentional tort of assault and that Metro was, therefore, liable pursuant to Tennessee Code Annotated section 29-20-202(a). The Court of Appeals affirmed, concluding that because there was no evidence that the Defendant intended to harm the Plaintiff, he did not commit an assault.

As we have stated, the GTLA sets forth the parameters of Metro's immunity from suit for actions that the Defendant took within the scope of his employment. There are two relevant exceptions to the general rule of immunity from suit in Tennessee Code Annotated section 29-20-201. First, the GTLA removes immunity for all governmental entities "for injuries resulting from the negligent operation by any employee of a motor vehicle or other equipment while in the scope of employment." Tenn. Code Ann. § 29-20-202(a). Second, the GTLA, more generally, provides that immunity is removed "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment." Tenn. Code Ann. § 29-20-205. This latter provision is subject to several enumerated exceptions, including a list of intentional torts in section 29-20-205(2). Conspicuously absent from this list of exceptions are the torts of assault and battery. See Limbaugh v. Coffee Med. Ctr., 59 S.W.3d 73, 83 (Tenn. 2001). In Limbaugh, this Court ruled that a governmental entity, under appropriate circumstances, could be held liable for an assault and battery by an employee, observing

> that section 29-20-205 of the GTLA removes immunity for injuries proximately caused by the negligent act or omission of a governmental employee except when the injury arises out of only those specified torts enumerated in subsection (2). To immunize all intentional torts would result in an overly broad interpretation of the statute, and there is no indication that the legislature intended such a result. Indeed, we find it noteworthy that the legislature excluded the two intentional torts most likely to give rise to injury.

Id. at 84 (citation omitted).

In Limbaugh, a resident made a direct showing that the defendant nursing home, a governmental entity, had failed "to take reasonable precautions to protect its residents from the risk of abuse by th[e] aggressive nursing assistant" who committed an assault against the resident. Id. Because the governmental entity negligently supervised its employee, and the resident suffered an injury from an intentional tort, assault and battery, not included in the enumerated list in section 29-20-205(2), we held that the governmental entity's immunity from suit was removed. Id. Since 2001, the Court of Appeals has correctly interpreted

Limbaugh to mean that "the GTLA does not allow plaintiffs to hold governmental entities vicariously liable for intentional torts not exempted under section 29-20-205(2), but rather requires a direct showing [of] negligence on the part of the governmental entity." Pendleton v. Metro. Gov't of Nashville & Davidson Cnty., No. M2004-01910-COA-R3-CV, 2005 WL 2138240, at *3 (Tenn. Ct. App. Sept. 1, 2005); see also Baines v. Wilson Cnty., 86 S.W.3d 575, 581 (Tenn. Ct. App. 2002). Because an assault or a battery is not a negligent act, see Limbaugh, 59 S.W.3d at 84, the "negligent act or omission" required to waive immunity under section 29-20-205 does not refer to the intentional tort. When, therefore, there has been no showing of negligence by the governmental entity in supervision of one of its employees acting within the scope of employment, the exception to sovereign immunity set forth in section 29-20-205 will not apply. As the Court of Appeals observed in the case before us, the trial court concluded that the Plaintiff "'failed to prove negligent supervision,' and this finding is not challenged on appeal." Hughes, 2010 WL 424240, at *12.

Whether Metro's immunity is waived, therefore, depends on how we classify the Defendant's action. If the Defendant was negligent in his operation of the front-end loader, then Metro's immunity from suit would be removed under both Tennessee Code Annotated sections 29-20-202(a) and 205. If the Defendant committed an assault, however, then neither of those sections would operate to remove immunity, and the Plaintiff's suit may proceed only as to the Defendant.

Our consideration of whether the Defendant's act was negligent or intentional requires us to determine whether the commission of the intentional tort of assault requires an intent to actually harm another. The Court of Appeals, relying upon this Court's decision in Huffman v. State, 292 S.W.2d 738 (Tenn. 1956), overruled on other grounds by State v. Irvin, 603 S.W.2d 121 (Tenn. 1980), concluded "that under Tennessee law, the intentional tort of assault requires a showing of intent to harm rather than mere intent to frighten." Hughes, 2010 WL 424240, at *13. In Huffman, this Court cited to 6 C.J.S. Assault & Battery § 60 for the proposition that "'[a]n assault may consist of any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person.'" 292 S.W.2d at 742; see also Johnson v. Cantrell, No. 01A01-9712-CV-00690, 1999 WL 5083, at *3 (Tenn. Ct. App. Jan. 7, 1999) ("[A] defendant is not subject to liability for assault unless he or she commits an intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff."). The Court of Appeals construed these statements to mean that in order to prevail on a claim of assault, a plaintiff must show that the defendant intended harm, although recovery is permissible "if he [or she] is injured or if he [or she] reasonably apprehends physical harm." Hughes, 2010 WL 424240, at *13.

In contrast, several modern treatises have suggested that one may be liable for assault

if he or she merely intends to place another person in fear. The Restatement (Second) of Torts provides that a person may be held liable for an assault "if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." Restatement (Second) of Torts, § 21(1) (1965); see also id. at § 28 ("If the actor intends merely to put the other in apprehension of a bodily contact, he is subject to liability for an assault to the other if the other, although realizing that the actor does not intend to inflict such a contact upon him, is put in apprehension of the contact.").[13] Other treatises also recognize that an assault may be predicated upon either intent to harm or intent to frighten. See, e.g., 6A C.J.S. Assault § 1 (2004) ("[A]ssault occurs where a person: (1) acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (2) the other is thereby put in such imminent apprehension."); 1 Dobbs, The Law of Torts § 33, at 63 ("An assault is an act that is intended to and does place the plaintiff in apprehension of an immediate unconsented-to touching that would amount to a battery [and t]he plaintiff's subjective recognition or apprehension that [he or] she is about to be touched in an impermissible way is at the core of the assault claim."); W. Page Keeton, Prosser & Keeton on the Law of Torts § 10, at 43 (5th ed. 1984) ("The interest in freedom from apprehension of a harmful or offensive contact . . . , as distinguished from the contact itself, is protected by an action for the tort [of] . . . assault."). The Prosser & Keeton treatise further provides that "[t]he defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff." Id. § 8, at 36-37 (footnotes omitted).[14]

While the tort of assault is not statutorily based, there is authority for the proposition that "courts may refer to the statutory definition of the crime" in civil actions. 6 Am. Jur. 2d Assault & Battery § 85 (2008). In Tennessee, a person commits criminal assault who: "(1)

---

[13] Comment a to section 28 clarifies that an actor will be liable even if the other realizes that the actor intended only to frighten him, so long as he believes "that there is a chance that the act will go beyond its intended purpose and cause a harmful or offensive contact."

[14] Other jurisdictions have similarly held that an intent to harm is not an essential element of the intentional tort of assault. See, e.g., White v. Muniz, 999 P.2d 814, 819 (Colo. 2000) ("With regard to the intent element of the intentional torts of assault and battery, . . . a plaintiff must prove that the actor desired to cause offensive or harmful consequences by his act. The plaintiff need not prove, however, that the actor intended the harm that actually results."); Brown v. State Auto. & Cas. Underwriters, 293 N.W.2d 822, 825 (Minn. 1980) ("Intent to do an act is a central issue in an assault and battery action. However, proof of intent to injure is not required for a plaintiff to recover on an assault and battery theory."); Bowie v. Murphy, 624 S.E.2d 74, 80 (Va. 2006) (quoting Etherton v. Doe, 597 S.E.2d 87, 89 (Va. 2004) ("To prove assault, a plaintiff must show that the defendant performed an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in the other person's mind a reasonable apprehension of an imminent battery." (internal quotation marks omitted))).

[i]ntentionally, knowingly or recklessly causes bodily injury to another; (2) [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) [i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a) (2010). In State v. Wilson, 924 S.W.2d 648 (Tenn. 1996), this Court considered the mens rea element of aggravated assault, a crime committed when a person "[i]ntentionally or knowingly commits an assault as defined in [Tennessee Code Annotated section] 39-13-101 and" either "[c]auses serious bodily injury to another" or "[u]ses or displays a deadly weapon." Tenn. Code Ann. § 39-13-102(a)(1) (2010). We held that it was not enough for the state to establish beyond a reasonable doubt that the defendant fired his weapon at the victims' residence "and that the victims reasonably feared imminent bodily injury." Wilson, 924 S.W.2d at 650. Rather, in order to satisfy the mens rea element of the statute, the state had to "prove either that defendant shot into the [victims'] home (a) for the purpose of causing the victims to fear imminent bodily injury (intentionally) or that defendant was (b) aware that the shooting would cause the victims to fear imminent bodily injury (knowingly)." Id. at 651. Wilson confirmed that which is apparent from the statute: one may be guilty of criminal assault pursuant to section 39-13-101(a)(2) by acting with intent or knowledge and causing another to reasonably fear imminent harm.[15]

In our view, if a defendant intends to create an apprehension of harm in the plaintiff, he or she has committed the intentional tort of assault. The weight of authority supports that determination. By so holding, we draw upon the definition of assault in our criminal statutes and the cases interpreting it. See 6A C.J.S. Assault § 1 ("The elements of assault may be the same in criminal and civil cases."). The evidence in the record supports the conclusion that the Defendant, even if engaging in horseplay,[16] committed the intentional tort of assault

---

[15] We recognize that an early decision of this Court, Richels v. State, provided that "[t]he intention to do harm is the essence of the offence" of assault. 33 Tenn. (1 Sneed) 606, 608 (1854); see also Casey v. State, 491 S.W.2d 90, 93-94 (Tenn. Crim. App. 1972) ("[A]n intent to do bodily harm is essential to constitute an assault."). In another early case, however, this Court suggested that proof of an intent to frighten may be sufficient to convict a defendant of assault. Cowley v. State, 78 Tenn. 282, 283 (1882) (affirming a jury charge stating that the crime of assault would be committed if the defendant fired his pistol into a residence with the intent to injure or frighten the occupants); see also Harrell v. State, 593 S.W.2d 664, 670 (Tenn. Crim. App. 1979) (quoting State v. Bitting, 291 A.2d 240, 242 (Conn. 1971) ("At common law, an essential element of assault is an intent either to frighten or harm.")). Moreover, cases defining the common law crime of assault in Tennessee are of limited value in interpreting our present statute, which clearly contemplates criminal liability for a defendant who intentionally or knowingly places another in fear of an imminent bodily injury.

[16] The Plaintiff contends that mere participation in horseplay does not constitute an intentional tort. See Ransom v. H.G. Hill Co., 326 S.W.2d 659, 663 (Tenn. 1959) (holding that workers' compensation
(continued...)

because he intended to frighten the Plaintiff. The trial court found that the Defendant "intended to carelessly drive" the vehicle, "making the noise and commotion that was going to be associated with it." The trial court further concluded that it was "foreseeable that by causing that type of noise and commotion, that somebody might be startled, frightened, shocked, . . . trip, and be hurt." Three eyewitnesses testified that immediately after the event occurred, the Defendant approached the injured Plaintiff to assure him that he was only "trying to scare" him, rather than actually harm him.[17] Although the Defendant denied making this statement or engaging in any sort of horseplay, the trial court rejected his testimony by holding that the Defendant intended to "do something very foolish and cut up as he was coming through there and rev up his front[-]end loader and bounce it through this little spot and make a lot of noise."

Because the evidence establishes that the Defendant intended to frighten the Plaintiff and perhaps others walking along the access road, he committed the intentional tort of assault. Evidence that the Defendant merely acted negligently in the operation of the front-end loader does not preponderate against the other findings of fact by the trial court. Further, there is no evidence that Metro was negligent in supervising the Defendant. Metro is, therefore, entitled to the protections of governmental immunity. The Plaintiff is, however, entitled to compensation from the Defendant for his injuries. The cause is, therefore, remanded for the entry of judgment.

**Conclusion**

Although the Defendant was acting within the scope of his employment, he committed the intentional tort of assault against the Plaintiff. Under these circumstances, Metro is entitled to governmental immunity. The Court of Appeals is reversed and the cause remanded to the trial court. Costs are assessed against the Defendant, Frank Archey, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

---

[16](...continued)
benefits may cover injuries resulting from certain types of horseplay occurring at the place of employment). We decline to apply Ransom to the issues presented here in light of the statutory mandate in Tennessee that the workers' compensation laws are to be liberally construed in the employee's favor. See Tenn. Code Ann. § 50-6-116; see also Nichols v. Jack Cooper Transp. Co., 318 S.W.3d 354, 360 (Tenn. 2010).

[17] As noted, the Plaintiff was unable to recall whether the Defendant told him that he "only" meant to scare him or that he "didn't" mean to scare him.