# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### January 30, 2012 Session

## GLENN DAVIS, ET AL. v. CHARLES BOWERS, ET AL.

### Appeal from the Chancery Court for Greene County
### No. 20090118      Thomas R. Frierson, II, Chancellor

### No. E2011-00295-COA-R3-CV-MARCH 9, 2012

Glenn Davis and Lisa Davis ("Plaintiffs") sued Charles Bowers and Wilda Bowers ("Defendants") and Greene County, Tennessee ("Greene County") seeking, *inter alia*, a declaratory judgment with regard to whether a passageway of approximately 198 feet in length on the north end of Duncan Lane was a private driveway or a public road. After a trial, the Trial Court entered an order finding and holding, *inter alia*, that the 198 foot section was not part of the public road. Defendants appeal raising issues regarding the purported dedication of the 198 feet, and the admission of evidence at trial. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Mark D. Edmonds, Jonesborough, Tennessee, for the appellants, Charles Bowers and Wilda Bowers.

Edward Kershaw, Greeneville, Tennessee, for the appellees, Glenn Davis and Lisa Davis.

## OPINION

## Background

Plaintiffs and Defendants each own real property located near Duncan Lane, a dead-end public county road in Greene County, Tennessee. A brief overview of title to the real property owned by Plaintiffs and Defendants is helpful to an understanding of the issues raised in this suit. Foay Clyde Williams and Sarah Ann Mae Chandley Williams took title to approximately twenty-four acres of real property in 1959. In 1978, the Williams conveyed a portion of their real property consisting of approximately one acre to Kenneth Andrew Chandley and Dorothy Ellen Chandley. After the death of Mrs. Williams, Mr. Williams conveyed his remaining approximately twenty-three acres to John Derrick and Patricia Derrick in 1983. Plaintiffs then took title to the approximately twenty-three acre tract by warranty deed in 2000. In 2003, Plaintiffs also acquired title to the approximately one acre tract previously deeded to Mr. and Mrs. Chandley. Thus, Plaintiffs by 2003 owned all of the approximately twenty-four acres deeded to Mr. and Mrs. Williams in 1959. In 2007, Defendants took title to a parcel of real property adjoining Plaintiffs' real property.

Issues arose between Plaintiffs and Defendants with regard to the status of an area approximately 198 feet in length ("Disputed Area") at the north end of Duncan Lane. According to the Greene County Highway Department, Duncan Lane extends for 1.15 miles. In 2004, the Greene County Highway Department applied a chip seal surface to Duncan Lane including the Disputed Area. In 2009, Plaintiffs filed this suit seeking, in part, a declaration as to the status of the Disputed Area. The case was tried without a jury.

Plaintiff Lisa Davis testified at trial. She explained that she and her husband had a survey done by Joe McCoy in the summer of 2000 when they purchased the twenty-three acre parcel. Mr. McCoy told Plaintiffs that the property line ended closer to the house that they were purchasing, approximately 60 feet from the property line of the Kenneth Chandley property. Mrs. Davis stated that Mr. McCoy said:

> he wanted me to know that the road ended there, and that there was a section of property that still belonged to us, but if he put it in our deed then we would need to go to the Chandleys and do a deed of correction, and we could possibly be land locked in if we didn't given them a right-of-way across that 60 some feet, 60 feet.

Mrs. Davis testified that at that time she and her husband did not have a problem with the situation because they were aware that the property had formerly been a family farm and they did not want to cause issues or stress for Kenneth Chandley who was elderly and in poor

-2-

health. Mrs. Davis testified that Mr. Chandley's mailbox previously had been down by her house, but had been moved closer to Mr. Chandley's trailer due to his health issues. Mrs. Davis testified that she had observed mail being delivered to the Chandley residence when Kenneth Chandley lived there.

Plaintiffs contend that Duncan Lane, the public road, ends in front of Defendants' barn. Mrs. Davis testified that when Greene County would grade Duncan Lane or fix potholes the County vehicles would come to an area in front of Defendants' barn where they then would turn around and go no farther. The area past Defendants' barn constitutes the Disputed Area.

Greene County chip sealed Duncan Lane including the Disputed Area in 2004. After that happened, Mrs. Davis made phone calls to the Greene County Road Department and attempted to speak to J.C. Jones, the Superintendent, to ask why her driveway had been chip sealed. Mrs. Davis never was able to speak with anyone in the Greene County Road Department who gave her any information, and she received no response to her phone calls. At that time, Mr. Davis was working out of town. Mrs. Davis was working third shift and caring for a four year old child, and she did not have time to keep making phone calls. Mrs. Davis explained that she was not terribly worried about the situation because she and her husband had never had any issues with Defendants' predecessor in title, Dr. Woelfel. She stated:

> I had come pretty much to the conclusion that with it being the end of the road, that maybe they had an extra mix, you know, an extra bucket or whatever, and they had just went ahead and just spread it on up through there. Knowing Kenneth, in our conversations when he was living, he had made several, several complaints about the road, and them knowing him and having daily conversations with him about the maintenance of the road, on down at the end of the road, I felt like that maybe they had just went in and just done it to appease him and did not know that he had passed away and was not living there.

Mrs. Davis testified that, after the Disputed Area was chip sealed, when Greene County did maintenance the County maintenance vehicles continued to turn around in the barn area and did not come on to the Disputed Area.

Mrs. Davis testified that there was an occasion during the fall of 2006 when her husband saw a vehicle drive up behind Kenneth Chandley's trailer. Mr. Davis investigated and discovered that the people who had driven up behind the trailer were

drinking, trying to break into one of the storage buildings, and about to harm Plaintiffs' dog. After this incident, Plaintiffs began to block access to the Disputed Area.

Mrs. Davis explained further that there were other incidents when she and her husband discovered vehicles driving up and going behind the trailer. As a result, Mrs. Davis sought documentation from the County regarding where the road ended. She testified that when she went to pay their 2007 taxes, she went to the Registrar of Deeds Office and then to the Building Committee Office where she met Tim Tweed. Mr. Tweed provided Mrs. Davis with a plat and an overhead photo of the area around her real property and showed her where Duncan Lane ended. Mrs. Davis testified that Mr. Tweed told her Duncan Lane ended right by the barn in the spot where she and her husband thought that it did. As a result, she and her husband blocked the Disputed Area beginning in January of 2007, and continuing until October 2008 when the County erected an end of county maintenance sign somewhere in the Disputed Area. During the time that they had the Disputed Area blocked, Plaintiffs had no issues.

In 2007, Defendants purchased Dr. Woelfel's property. Defendants' deed contains a reference point for where Duncan Lane ends. The deed by which Dr. Woelfel took title contains the same reference points as does the deed to Defendants.

Plaintiffs discovered in October of 2008 that an end of county maintenance sign had been erected. They attempted to contact the Road Superintendent but discovered that the office was closed. So Plaintiffs went to the Planning Commission Office and spoke with Tim Tweed who told them to talk to David Weems.

Mrs. Davis spoke with Mr. Weems by phone, and he agreed to come out and do a GPS of Duncan Lane. Mr. Weems did the GPS and told Mrs. Davis that the length of the road was 1.15 miles as was listed on the Greene County Road List. When the County did the GPS, the 1.15 miles ended where the end of county maintenance sign was located.

Plaintiffs then obtained a copy of Defendants' deed, found a reference point, and compared measurements to the survey referenced in Defendants' deed. Mrs. Davis testified that they discovered that Defendants' deed does reference the end of the road as being where Plaintiffs believed it to be. Mrs. Davis testified that when they discovered this, "David kinda turned to Gary and made the comment 'We made a mistake. We should never done that. We should never chip sealed that.'" She testified that Mr. Weems has been consistent in that opinion and stated:

> David explained to me that in 2004 when the grants were given to the Road
> Department to do maintenance on the roads, there was a lot of chip seal put

-4-

down, and it was, there was areas that were chip sealed that probably never should have been chip sealed. They didn't do a lot of research on exactly what were roads and what were private drives.

When asked about the width of the road Mrs. Davis stated:

In 2008 when the, when the county maintenance sign went up we went to the Building Committee Office. They provided us with a list that had the official road length on it. Also on that list it has it as a 15 foot roadbed, and that is all that they have listed on there, and it was only 15 feet. The road actually varies in width. It can go anywhere from 9, 12, 16 feet, you know, so forth. The actual opening that went into the Kenneth Chandley property, from fencepost to fencepost, was only 16 feet.

Mrs. Davis described a photo introduced as an exhibit at trial stating:

This is the area of the road that is between the bleed off valve for the county water line and the boundary fence between the Bowers and us. It shows the width of the roadbed being at 16 foot between post to post, and the bleed off valve, the meter, sets at about 14 foot, 6 inches…. That's, yeah, that [sic] the bleed off valve. That's where they come and do maintenance on the end of, end of the water line. The meter actually sets to the right of the blue, blue marker there.

Plaintiff Glenn Davis testified that his understanding was that Duncan Lane ended down around the barn. He testified that Greene County has not maintained past that point, and further stated that even after the Disputed Area was chip sealed Greene County never maintained it. Mr. Davis stated that they never heard any complaints about their blocking the Disputed Area until September or October of 2008 when Green County erected the end of county maintenance sign. Both Mr. and Mrs. Davis testified that they are prepared to pay Greene County $200 for the value of the chip seal of the Disputed Area depreciated over time.

Joe McCoy has been a land surveyor since 1979. The parties stipulated to Mr. McCoy's expertise as a surveyor. Mr. McCoy surveyed the property for Mr. and Mrs. Davis in August of 2000. He explained that the end of Duncan Lane is as shown in Defendants' deed and thus does not include the 198 feet at issue.

John Derrick, the former owner of the approximately twenty-three acres purchased by Plaintiffs, testified at trial. Mr. Derrick testified that Duncan Lane ended by

Defendants' barn as Plaintiffs contend. Mr. Derrick also testified about a 1998 petition, which he and other property owners signed. Mr. Derrick explained the reason for the petition stating: "It was just sort of, [Duncan Lane] wasn't very wide, and we all got together 'cause we had to, we knowed we'd have to chip in a little bit of land on each side to make it wider. So we got up that petition to do so." Mr. Derrick stated that the petition did not have anything to do with the Disputed Area. Mr. Derrick explained that Duncan Lane did not go to Mr. Chandley's lot. Instead, Mr. Chandley had a right-of-way to get to his property. Mr. Derrick testified that nothing ever happened with regard to the petition.

Dale Tipton who owns property on Duncan Lane and has lived there for fifty-four years also testified that Duncan Lane ends by Defendants' barn. Mr. Tipton based this assertion on deeds and maps, and what everybody understood and used over the years. Mr. Tipton was asked about Greene County doing maintenance on Duncan Lane and he stated:

> Ah, let me tell you how it happened. Two guys lived at Rheatown, run the maintainers, and they just simply, when they, when they graded the road over here where they was supposed to grade, they went up here and leveled it up for the people 'cause it was their friends and that's all. The County knew nothing about that. I don't think.

Mr. Tipton testified that Greene County did not maintain the Disputed Area.

Mr. Tipton was one of the property owners who signed the 1998 petition. He stated:

> This was a petition, everybody that lived there went down to the office, to this guy right here's office, … This, talked to the other guy that, I forgot his name. Anyway, he was supposed to widen out the road and several places on the road cars couldn't pass.… He was supposed to widen that out and that's what this petition was supposed to have stated. Anyway, he took what was wrote out on the petition we signed and transferred it over to this and put his own header on this thing. That wasn't on there when we signed this. Everybody that signed it said so.

When asked if anything had happened on the petition, Mr. Tipton stated: "Well, they didn't fix the road 'til they put the chip seal on it, and there's still a couple or three places that cars can't pass on it. They didn't widen it out then." Mr. Tipton testified that the petition did not cover the Disputed Area.

J.C. Jones, a retired Highway Superintendent in Greene County, testified at trial. Mr. Jones was the Highway Superintendent from 1990 to 2006. Duncan Lane was a county road before Mr. Jones began working as the Highway Superintendent. When asked where Duncan Lane ended, Mr. Jones stated: "There was a cross fence in the back, and we maintained to the last mailbox, and they'd turn around where that last mailbox was…. There was a mobile home, something on the right at the end of the road. There was a fence across where the road stopped there."

When asked if the County may have accidently chip sealed the Disputed Area, Mr. Jones stated: "No, Sir. My foreman, he, he'd been there since he'd got out of high school, and he was in charge of this, this chip seal." When asked again about the possibility that the chip seal was done accidently, Mr. Jones stated: "No, no. I'd fired the whole crew at the time."

Mr. Jones agreed that it could be an error that the water meter was placed within 15 feet of the roadway, which is not proper according to code. Mr. Jones also agreed that prior to the passage of the Uniform Road Law there were no restrictions on what a road superintendent could do including work on private property. He further agreed that it was fairly common practice for the Road Department to gravel a driveway if there was a death in the family. Mr. Jones stated that he had "witnessed that." Mr. Jones agreed that the Uniform Road Law provided that a superintendent who did work on private property would be guilty of a crime, and that any employee who willingly, knowingly, and intentionally performed work on private property would be fired.

When asked, Mr. Jones agreed that the state furnished some money to do work on state aid roads and that Greene County had to identify how long the road was "[w]ithin plus or minus a tenth." Mr. Jones agreed that the one-tenth of a mile, 528 feet, requirement "was for the protection of the highway superintendent, yeah. And the men. They had copies of the [road] list too, most of them."

When asked about how he determined whether a road should be on the Road List while he was the superintendent Mr. Jones stated:

> We used a lot of different ways, Roger. The map, the 85 list, we got the mailboxes, had a lot of people, 30, 40 year employees, that had drove dump trucks and run road graders. We brought them in one at a time. Where did you work to? What's your, where did you quit on this dead end? Thru-roads wasn't a problem, but dead ends were.

Mr. Jones also agreed that even into the 2000s they were still trying to identify the parameters of some county roads.

There was no system to keep track of road improvements or maintenance when Mr. Jones came into office. He implemented a system to document man-hours, materials, and equipment used when work on a road was done. An exhibit was introduced at trial showing the man-hours and materials for the chip sealing of Duncan Lane. Mr. Jones testified that maintenance of roads also was documented in a similar manner. Mr. Jones stated that there should be work orders for anything that was done on Duncan Lane from the time he implemented the work order system in the early 1990s.

W. Henry Bailey, a real estate appraiser, testified as an expert in planning commissions regulations relating to subdivision. Mr. Bailey explained that he was on the Church Hill Planning Commission from 1976 through 1978, and he has been on the Mount Carmel Regional Planning Commission since 2002. Mr. Bailey testified that the rules and regulations that apply to the Mount Carmel Regional Planning Commission also would apply in Greene County. Mr. Bailey testified that from what he was able to determine there was a regional planning commission in Greene County in 1972. Mr. Bailey stated that regional planning commission rules were standard in the 1970s that any subdivision with two or more tracts had to be approved by the planning commission prior to recording the transfer of property. He agreed that there were no acreage restrictions at that time.

Mr. Bailey testified that he is familiar with Duncan Lane and has looked at the relevant deeds. He stated that the "subdivision" wherein Mr. and Mrs. Williams deeded approximately one acre to Mr. and Mrs. Chandley was an illegal subdivision. Mr. Bailey stated that one cannot create a public road by illegally subdividing. Mr. Bailey testified that he is aware that Defendants have attempted to subdivide their land and that the only way this will be legal is if the Disputed Area is declared to be a public road, otherwise there is insufficient road frontage to allow subdivision.

Defendant Wilda Joyce Bowers testified at trial. Mrs. Bowers stated that she had an interaction with Mr. Davis one day after church when she went "[t]o the end of the road where [Plaintiffs] live and where we have the barn." When asked about this statement concerning "the end of the road …," Mrs. Bowers insisted that she did not mean that was the end of the road, but instead meant "that was the end of my destination that particular night.… Because that's where I had to turn around." Mrs. Bowers claimed she did not see anything blocking the Disputed Area for almost two years. When asked further, Mrs. Bowers stated that she and her husband had discussed the fact that a truck was blocking the Disputed Area, but she claimed that she did not see this obstruction every day.

Amy Tweed, the Greene County Planning Coordinator, testified. Ms. Tweed has worked in the Planning Office since 2005. Prior to that she had worked in the Building and Zoning Office since 1993. Ms. Tweed has encountered illegal subdivisions from time to time. Ms. Tweed testified that when they encounter an illegal subdivision:

> We will ask them, we'll look into each case differently. We'll pull the recorded deeds of the property that's been recorded to go back and see when the actual creation of the parcel was done. Our subdivision regulations was [sic] adopted in 1972 and our zoning regulation was adopted in 1984, so depending on what criteria the plat doesn't meet, we'll go by one of those regulations to see if it was a legal nonconforming piece of property or a legal conforming piece of property.

Ms. Tweed was asked what was the easiest way to correct an illegal subdivision, and she stated:

> We try to conform to the regulations as closely as possible. We'll send it to the Planning Commission if it doesn't meet the regulations 100 percent. The Planning Commission has the jurisdiction to either grant approval or to denial [sic], and then we have a Board of Zoning Appeals that can grant a variance to the regulations.

Ms. Tweed testified that de-subdivision is an acceptable way of making an illegally subdivided tract legal. She explained:

> De-subdivision is when you have two tracts of property that's described in two separate tracts or lots having their own calls for each line, and their directional calls. If you want to group or de-subdivide, is what we use the terminology, to put two tracts together you would be taking your interior lot line out. You would be removing that lot line. So de-subdividing would be putting two tracts together, having one deed description for that lot.

Ms. Tweed agreed that de-subdivision is done from time to time. She also agreed that one cannot create a county road by illegally subdividing. Ms. Tweed knew of no instances where a county road had been created or included on the county road list based on an illegal subdivision.

Gary Rector is a supervisor with the Greene County Highway Department and has been employed with the department for 26 and a half years. Mr. Rector has been the second-in-command for approximately 20 years. Mr. Rector testified that at some time

-9-

during his employment the Greene County Commission approved two road bonds totaling approximately sixteen million dollars. Prior to that time there were about 600 to 650 miles of gravel road in Greene County. Mr. Rector explained that after the road bonds many roads were surfaced or re-surfaced and the total miles of gravel road left was approximately 20 to 25 miles.

Mr. Rector testified that it is his understanding that the Greene County Road List has to be maintained to within one tenth of a mile as to the length of each road. Mr. Rector agreed that given the length of Duncan Lane, the closest they had to get to the correct distance was within approximately 500 feet. When asked what steps the Highway Department would take to ascertain where roads ended, Mr. Rector stated: "Well, we, we'd take it on our knowledge that we'd, where we'd maintained it over the years, other, you know, other employees down there that they had maintained it over the years, and that's what we went by." Mr. Rector was asked about how he, as a supervisor, would make decisions about where to chip seal and how far to go and he stated:

> Well, most of the time you could tell where the County had maintained the road before. If there was a question we would talk to some of the older employees, where they had maintained before, or there'd be a mailbox at the end or something like that.… Well, most of the time the mail would not deliver on nothing that wasn't a county road, unless there was a circumstances [sic], you know, where they've got handi, handicapped or something like that.

Mr. Rector's recollection was that during the 1980s and 1990s only normal maintenance was done on Duncan Lane. He stated: "Only recollection I know that we chip sealed it … at a time, I think it was in 2004." Mr. Rector's office did a search for work orders on Duncan Lane and all that they could locate dated from 2004 to the present time.

When asked how they determined what to chip seal on Duncan Lane Mr. Rector stated: "Well, we measured it on a speedometer, at that time is all we had, and, and the way the road looked up to that mailbox, looked like it'd been maintained before." Mr. Rector has no knowledge of doing anything on the Disputed Area other than the chip seal. When asked if it were possible that they accidentally chip sealed a private drive, Mr. Rector stated: "I can't say we did or didn't."

David Weems, the Road Superintendent for the Greene County Highway Department, testified at trial. Mr. Weems was elected to his position in 2006. With regard to Duncan Lane, Mr. Weems testified that since he was elected the Department has "repaired some spots with our asphalt chipper … and rechipped those, then routine maintenance as far as bushhogging and that kind of stuff." When the issue arose about the Disputed Area Mr.

Weems spoke with some employees who had been with the Greene County Highway Department for several years and some could remember working on Duncan Lane but none could tell him whether they worked on the Disputed Area.

Mr. Weems admitted that this is not the first road where issues regarding length such as the one in this case have arisen, and this is not the first lawsuit that has been filed regarding such issues. When asked if he had told Mr. and Mrs. Davis that the Greene County Highway Department should not have chip sealed the Disputed Area, Mr. Weems stated:

> I, I don't remember making that exact statement. I, I just, I think I said, that's been two years ago, but something along the lines, after reading the deeds and that kind of thing, my, my opinion was that the last 200 feet could be a, you know, a private drive or something.

Mr. Weems agreed that it was his understanding that the Greene County Highway Department could traverse across private property and improve it in order to get to a mailbox. He also agreed that the photographs introduced into evidence at trial show that the Disputed Area has "grown up" and does not appear to have been maintained by Greene County.

After the trial, the Trial Court entered its Judgment on January 5, 2011 finding and holding, *inter alia*, that the Disputed Area was a private right-of-way, not a part of the public road Duncan Lane. In its November 22, 2010 Memorandum Opinion incorporated into the January 5, 2011 Judgment by reference, the Trial Court specifically found and held, *inter alia*:

> According to the 1998 official road list of the Greene County Highway Department, Duncan Lane is a dead end, public road located in the 15[th] civil district of Greene County, Tennessee. The road extends from Pleasant Vale Road a distance of approximately 1.15 miles. The Defendant, Greene County, Tennessee, asserts that the distance of roads listed on the official Greene County road list is only required to be determined to within one-tenth of a mile. By incorporating present day GPS technology, the Greene County Highway Department now can ascertain the distance of county roads more precisely.

> According to the testimony of registered land surveyor Joseph G. McCoy, III, the northern terminus of Duncan Lane is at a point so identified on Trial Exhibit 27. This location is approximately 60 feet south of the property line of the former Chandley tract. The existing roadway has been

-11-

marked with orange paint thereby indicating the northern terminus of Duncan Lane.

The testimony of several witnesses corroborate this ending point of Duncan Lane. Further, aerial photographs likewise confirm the road terminus location as described by Mr. McCoy. This Court concludes that the evidence preponderates in favor of finding that the public road, Duncan Lane, maintains a northern terminus as so established by surveyor Joseph G. McCoy, III.

* * *

The Court has carefully considered the testimony of the parties and witnesses with an aim toward determining whether over the course of several years an offer and acceptance of dedication ever occurred. Based upon the foregoing analysis and considering the factual background in the instant action, this Court determines that at no time have Plaintiffs, or any of their predecessors in title formally declared an appropriation of the passageway in dispute to Greene County, Tennessee for use by the public. As such, an express dedication of private property to public use has not been accomplished.

With reference to whether an implied offer of dedication of the passageway for public use was made, the Court determines that the Defendants who posit that Duncan Lane is a public road have failed to clearly and unequivocally prove that any landowners have intended to permanently part with the land and vest it in the public, see *Cole v. Dych*, 535 S.W.2d 315 (1976). The Bowers argue that an implied dedication of property for public use occurred by reason of the 1978 subdivision of property resulting from the land acquisition by Mr. and Ms. Chandley. The Defendants' argument is unpersuasive. Although the Greene County Regional Planning Commission then was empowered pursuant to T.C.A. 13-3-401, *et seq.*, to adopt regulations governing subdivision of property and public roads, any disregard for subdivision regulations and road requirements did not entitle one to claim the benefit of the doctrine of implied dedication, see *Shahan v. Franklin County*, 2003 LEXIS 929 (Tenn. App. 2003).

The evidence also preponderates in favor of a finding that through the years, members of the public have infrequently traversed the 198 foot passageway. During the 1980s and the 1990s, the passageway was used by the United States Postal Service for the delivery of mail to the home of Mr. and

Ms. Chandley. The evidence further supports a finding that the Greene County Highway Department performed work on the passageway in dispute during a single occasion in 2004. This Court determines that the affected landowners simply acquiesced in the public's use of the passageway as a thoroughfare for limited and sporadic use. The Court, therefore, concludes that an implied offer of dedication of this passageway for public use has not occurred. As such, the passageway is a private right-of-way.

(footnotes omitted). Defendants appeal to this Court.

## Discussion

Although not stated exactly as such, Defendants raise four issues on appeal: 1) whether the Trial Court erred in finding that there was no dedication of the Disputed Area for public use; 2) whether the Trial Court erred in finding that Greene County never accepted the purported dedication; 3) whether the Trial Court erred in basing its judgment on the testimony of the surveyor, Mr. McCoy; and, 4) whether Defendants were prejudiced by the admission of evidence intended to impeach a witness who never was called to testify.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in finding that there was no dedication of the Disputed Area for public use. As this Court explained in *Reece v. Brown*:

Dedication arises from an owner's offer of land for public use, *see Stoker v. Brown*, 583 S.W.2d 765, 766 (Tenn. 1979); *Winn v. Tucker Corp.*, 848 S.W.2d 64, 68 (Tenn. Ct. App. 1992), and a public acceptance of the offer. *See West Meade Homeowners Ass'n, Inc. v. WPMC, Inc.*, 788 S.W.2d 365, 366 (Tenn. Ct. App. 1989). The offer and acceptance may be express or implied. *See Town of Benton v. Peoples Bank of Polk County*, 904 S.W.2d at 602; *Winn v. Tucker Corp.*, 848 S.W.2d at 68.

A party seeking to establish an implied offer of dedication must clearly and unequivocally prove the owner's intent to permanently part with the land and vest it in the public. *See Jackson v. Byrn*, 216 Tenn. 537, 543, 393 S.W.2d

-13-

137, 140 (1965); *McKinney v. Duncan*, 121 Tenn. 265, 271, 118 S.W. 683, 684 (1908); *City of Athens v. Burkett*, 59 S.W. 404, 408 (Tenn. Ch. App. 1900). Courts do not attempt to divine the owner's intent "kept concealed in the mind, but that which is manifest in the [owner's] visible conduct." *See Johnson City v. Wolfe*, 103 Tenn. 277, 282, 52 S.W. 991, 992 (1899); *Nicely v. Nicely*, 33 Tenn. App. 589, 594, 232 S.W.2d 421, 423-24 (Tenn. Ct. App. 1949). Accordingly, courts may infer intent from circumstantial evidence, including the owner's actions. *See Cole v. Dych*, 535 S.W.2d 315, 319 (Tenn. 1976); *Rogers v. Sain*, 679 S.W.2d 450, 453 (Tenn. Ct. App. 1984).

The courts consider a number of factors when asked to determine whether a property owner intended to dedicate the land. These factors include: (1) whether the owner invited or acquiesced in the public's use of the property as a thoroughfare or roadway; (2) whether the public has maintained or repaired the roadway; and (3) whether the public has used the property for an extended period of time. *See Cole v. Dych*, 535 S.W.2d at 319; *Town of Benton v. Peoples Bank of Polk County*, 904 S.W.2d at 602; *Rogers v. Sain*, 679 S.W.2d at 453. However, unlike an easement by prescription, an implied dedication does not depend on use for any particular period of time. *See Johnson City v. Wolfe*, 103 Tenn. at 283-84, 52 S.W. at 992; *Scott v. State*, 33 Tenn. 629, 633 (1854).

*Reece v. Brown*, No. M1997-00217-COA-R3-CV, 2000 Tenn. App. LEXIS 329, at **10-12 (Tenn. Ct. App. May 23, 2000), *no appl. perm. appeal filed*.

With regard to this issue the Trial Court specifically found and held:

The Court has carefully considered the testimony of the parties and witnesses with an aim toward determining whether over the course of several years an offer and acceptance of dedication ever occurred. Based upon the foregoing analysis and considering the factual background in the instant action, this Court determines that at no time have Plaintiffs, or any of their predecessors in title formally declared an appropriation of the passageway in dispute to Greene County, Tennessee for use by the public. As such, an express dedication of private property to public use has not been accomplished.

With reference to whether an implied offer of dedication of the passageway for public use was made, the Court determines that the Defendants who posit that Duncan Lane is a public road have failed to clearly and

-14-

unequivocally prove that any landowners have intended to permanently part with the land and vest it in the public, see *Cole v. Dych*, 535 S.W.2d 315 (1976). The Bowers argue that an implied dedication of property for public use occurred by reason of the 1978 subdivision of property resulting from the land acquisition by Mr. and Ms. Chandley. The Defendants' argument is unpersuasive. Although the Greene County Regional Planning Commission then was empowered pursuant to T.C.A. 13-3-401, *et seq.*, to adopt regulations governing subdivision of property and public roads, any disregard for subdivision regulations and road requirements did not entitle one to claim the benefit of the doctrine of implied dedication, see *Shahan v. Franklin County*, 2003 LEXIS 929 (Tenn. App. 2003).

The evidence also preponderates in favor of a finding that through the years, members of the public have infrequently traversed the 198 foot passageway. During the 1980s and the 1990s, the passageway was used by the United States Postal Service for the delivery of mail to the home of Mr. and Ms. Chandley. The evidence further supports a finding that the Greene County Highway Department performed work on the passageway in dispute during a single occasion in 2004. This Court determines that the affected landowners simply acquiesced in the public's use of the passageway as a thoroughfare for limited and sporadic use. The Court, therefore, concludes that an implied offer of dedication of this passageway for public use has not occurred. As such, the passageway is a private right-of-way.

The evidence in the record on appeal as discussed more fully above does not preponderate against the Trial Court's findings, particularly the finding that Defendants "failed to clearly and unequivocally prove that any landowners have intended to permanently part with the land and vest it in the public, …." Defendants argue on appeal that the right-of-way petition signed by the previous landowners acted as a dedication. We disagree, as did the Trial Court. The evidence in the record on appeal, most notably the testimony given by two of the signators of this petition, shows that this petition never was intended to apply to the Disputed Area. As such, this petition could not have acted as a dedication of the Disputed Area. We find no error in the Trial Court's determination that there had been no dedication of the Disputed Area to public use.

Our resolution of the first issue upholding the Trial Court's finding that there had been no dedication to public use pretermits the necessity of considering whether the Trial Court erred in holding that Greene County never accepted the purported dedication. There simply was no dedication of the Disputed Area which Greene County could have accepted.

-15-

In the interest of completeness, however, we briefly address two of Defendants' arguments with regard to this issue. First, even if we had found that a dedication of the Disputed Area was made by virtue of the 1998 petition as argued by Defendants, which we do not, the record on appeal does not support a finding that this purported dedication ever was accepted by Greene County as the evidence shows that no action whatsoever was taken with regard to this petition. Second, Defendants argue that the fact that Duncan Lane has appeared on the Greene County Road List since at least 1998 shows that the County accepted a dedication. What this argument fails to acknowledge is that no one contests that Duncan Lane is a public road. Rather, the issue concerns whether the Disputed Area at the northern end of Duncan Lane is part of the public road. The fact that Duncan Lane is listed on the Greene County Road List proves nothing as there is no dispute that a portion of Duncan Lane is a public road.

We next consider whether the Trial Court erred in basing its judgment on the testimony of the surveyor, Mr. McCoy. In their brief on appeal, Defendants admit that they stipulated to the expertise of Mr. McCoy as a surveyor, but argue, in essence, that the Trial Court somehow erred in the weight that it assigned to the testimony of Mr. McCoy.

To begin, we note that as our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011). Thus, we afford considerable deference to the Trial Court with regard to the weight to be given to testimony.

In their brief on appeal, Defendants appear to assert that the Trial Court based its judgment solely or primarily on the testimony of Mr. McCoy. A careful and thorough review of the record on appeal and the Trial Court's detailed November 22, 2010 Memorandum Opinion, however, reveal that such is not the case. It is clear that the Trial Court considered all of the relevant evidence properly admitted at trial when making its findings of fact and conclusions of law. We find nothing in the record that supports an

assertion that the Trial Court somehow erred either in considering Mr. McCoy's testimony, or in determining the weight to be given to this testimony. This issue is without merit.

Finally, we consider whether Defendants were prejudiced by the admission of evidence intended to impeach a witness who never was called to testify. Evidence was introduced at trial about the conduct of Defendants' son. Plaintiffs asserted that this evidence was introduced for the purpose of impeaching Defendants' son, who, in the end, did not testify at trial. In their brief on appeal, Defendants argue that this evidence "tainted the proceedings such as to be unfair to [Defendants]."

Defendants properly acknowledge in their brief on appeal that "where the judgment is the product of a bench trial, the likelihood of harm from erroneously admitted evidence is less than where a jury is involved, because the trial court is well qualified to decide what weight, if any, should be given to the evidence." We agree that a trial court is well qualified to determine what weight, if any, should be given to evidence. We are not saying, however, that a trial judge in a non-jury case is completely free to allow anything and everything in as evidence and then sort it all out later. What we are saying is that the chance that evidence being erroneously admitted will be reversible error is less likely in a bench trial than in a jury trial because the risk of harm to a party is much less in a bench trial.

A careful and thorough review of the record on appeal along with the Trial Court's Judgment and Memorandum Opinion reveals that the Trial Court did not consider the evidence about the conduct of Defendants' son when rendering its decision. Further, even if it was error to admit this evidence, it was harmless error as our considering the record as a whole shows that it did not "more probably than not [affect] the judgment or … result in prejudice to the judicial process." Tenn. R. App. P. 36 (b). We find this issue to be without merit.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Charles Bowers and Wilda Bowers, and their surety.

_____
D. MICHAEL SWINEY, JUDGE