

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2017 Session

## ROGER L. HOLT v. JIMMY CANTRELL, ET AL.

**Appeal from the Chancery Court for Bradley County**
**No. 2014-CV-105       Jerri S. Bryant, Chancellor**

_____

### No. E2016-01929-COA-R3-CV

_____

This appeal concerns access to real property ("the lake property") owned by Roger L. Holt ("Holt").   Holt sued Jimmy Cantrell,[1] Shirley Carroll and Tommy Cantrell ("Defendants") in the Chancery Court for Bradley County ("the Trial Court") alleging that he was entitled to access his property by means of a road bed ("the Disputed Road Bed") on Defendants' property ("the Cantrell property").  Holt advanced three alternative theories: that he was entitled to a prescriptive easement; that he was entitled to an easement by necessity; and that the Disputed Road Bed is a public road by implication. After a hearing, the Trial Court rejected all three of Holt's theories and dismissed his complaint.  Holt appealed to this Court.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

H. Franklin Chancey, Cleveland, Tennessee, for the appellant, Roger Holt.

Travis D. Henry, Cleveland, Tennessee, for the appellees, Shirley Carroll and Tommy Cantrell.

---

[1] Jimmy Cantrell is deceased.  Barbara Cantrell, Jimmy Cantrell's widow, joined in Defendants' answer to Holt's complaint insofar as the lawsuit affects her interest in the subject real property.  Barbara Cantrell was served but it is otherwise unclear from the record whether she ever was formally added as a defendant party in this lawsuit.  No party on appeal raises Barbara Cantrell's status as an issue.

# OPINION

## Background

The Disputed Road Bed is on a strip of land around 10 feet wide and 100 feet long running across the southern part of the Cantrell property in Bradley County. The Disputed Road Bed has been used previously for access to a rental home and to property known as the Johnson family property, which was landlocked. Holt owns 6.2 acres of property adjoining the Cantrell's property to the north with both situated along Patterson Road (formerly Lane). Holt's grandfather Marvin McClure purchased the property in 1964, and it has since passed down to Holt. The 6.2 acre property originally was part of a much larger tract of land owned by Holt's grandparents. Marvin McClure dug a lake and constructed an 80 square foot cabin on the property. The lake was stocked with fish. There also is a crude dam on the property. Holt, his family and friends frequented the lake property a number of times from the 1960s onwards. In the 2000s, family illnesses prevented the Holts from hosting recreational events on the lake property. Holt and other guests used the lake property for, among other things, fishing, camping, and church activities.

The Disputed Road Bed is one means of entering Holt's property. Another entrance is directly off the public road at an upper gate. In 1999, defendant Shirley Carroll placed a telephone pole across the Disputed Road Bed to keep out trespassers. In 2012, a gate was installed. Holt asserts that entry via the upper gate is insufficient because of the location of the lake and the harshness of the terrain on that side of the lake, hence this lawsuit seeking access through the Disputed Road Bed on the Cantrell's property.

In May 2014, Holt filed his complaint in the Trial Court. Holt, in successive amended complaints, advanced three theories: (1) that he is entitled to a prescriptive easement; (2) he acquired an easement by necessity; and, (3) the Disputed Road Bed is a public road by implication. This case was tried over the course of two days in August 2016, with a heavy emphasis at trial over how often the Holts and their guests made use of the Disputed Road Bed.

At trial, Holt produced photographs of Holt guests attending recreational events by the lake in different time periods. James Hamilton, a cousin of Holt, testified that in the '80s and '90s, he and others "pretty much lived" on the lake, and would stay "all summer." Don Sizemore, a Holt family friend who visited the lake, testified that in the '70s and '80s there was "cooking and stuff like that or gospel singing sometimes." Richard Elliston, another Holt family friend, testified: "During the summers of – I'm sure

-2-

during the summer of 1979 and also maybe a time or two during the summer of 1980 we would camp on that property." Holt's mother and sister testified to use of the Disputed Road Bed.

Holt himself testified to the background of the lake property and Disputed Road Bed as follows:

Q. Mr. Holt, you currently [are] the owner of the property that's at issue in this case?
A. Yes.
Q. Who was Marvin McClure?
A. My grandfather.
Q. Now, the deed reference that I saw indicates that he purchased this property in 1964. How old are you? When were you born?
A. '62.
Q. As a youngster, did you have occasions to be on this property?
A. Yes.
Q. Tell us about your earliest memories of that.
A. I can kind of remember when they dug the house. I always went fishing there, camped out, parties.
Q. Okay. Now, all through the 1960s, you'd have been six, seven, eight years old.
A. Yes.
Q. Were you out there in that period of time?
A. Yes.
Q. How frequently would your family be out there?
A. Every week.
Q. Now, do you live far away from this property?
A. No.
Q. As the crow flies, can you give an estimate to how far away it would be?
A. Less than a mile.
Q. Okay. What about through the 1970s, how often were you out there?
A. Every week.
Q. Now, on this property – what's on it, first of all?
A. A lake and a cabin.
Q. Do you know when the cabin was constructed?
A. I would guess in the later '60s.
Q. Now, what was this cabin utilized for?
A. Had a family live in it for a couple of years, and we've used it for overnight camp-outs and parties. Had a stove and --
Q. Is there utilities to it?

-3-

A. Yes.
Q. Public utilities?
A. Yes.
Q. Plumbing?
A. Not in the cabin, but there is a septic tank on the property.
Q. You said camping, how would you camp out there?
A. Campers, tents.
Q. So, both kinds?
A. Yes.
Q. Now, were you out there during the '80s?
A. Yes.
Q. Was there any change in the frequency with which you'd be out there?
A. No.
Q. Now, was it just utilized by family members?
A. No.
Q. Who else would go out there?
A. Friends, co-workers went with me, and the church used it for meetings and fundraisers.
Q. What kinds of church activities would be out there?
A. We've had like fall festivals and haunted houses in the cabin and just fundraisers for the church building fund, different things.
Q. Now, throughout the time that you had occasion to access the property in the '60s, the '70s, the '80s, let's say through the '90s, too, how would you come into this property?
A. Patterson Lane.

***

Q. Okay. Now, at the top of Exhibit 1, to the left of the orange section that we've been talking about on Patterson Lane, does your family have another gate there on that road?
A. I do, yes.
Q. And are you able to go into the property from that gate?
A. Yes.
Q. Can you access all of the property from that gate?
A. No, not by vehicle, and it would be difficult for a walker to do it.
Q. So, first of all, tell me why it's not accessible by vehicle.
A. There is a spring right here (indicating) that runs into the lake, and from there all the way to this end is just marsh. It sinks probably up to your waist if you step in it, so you can't go around this way. And there's not enough room for a vehicle to pass on this end of the lake.

-4-

Q. Now, I think the deed reflected that you became the owner of this property in 1991. Is that correct?
A. Yes.
Q. Between 1991 and 1999, did anybody from the Carroll family or the Cantrell family ever come to you and say, We've got a problem?
A. Not at all. No.
Q. Did you continue to use that property all during that period of time?
A. Yes.

Defendants called Charles Randall Brown, a surveyor, to testify. Brown had made observations of the property at issue. Brown testified regarding whether it would be feasible for a road to be built so that Holt could access his entire property from the upper gate:

Q. Mr. Brown, with regards to, and you've answered my question -- you answered more I think with regards to the dam -- but back to my original question, anything that you observed or that you saw would create any issues that would prevent them from being able to install a road coming off of Patterson Road leading all the way down to the dam?
A. I believe I could get a driveway there or a road.
Q. And once the steps were taken that you just described to Mr. Chancey, do you believe that that road could possibly be extended to the cabin?
A. Yes, sir.

Beth Long testified for Defendants on which means of entry she saw the McClures or Holts use to access the lake property:

Q. And when were you born?
A. 1961.
Q. Could you describe for us what Patterson Lane was like when you were growing up?
A. It was a dead end road. It was all family back there. We played on the road and rode bicycles. It was a graveled road until they paved it, I guess, early in the '70s, late '60s.

***

-5-

Q. Did you ever observe Marvin McClure or any of his relatives using the driveway that runs across the area that's in dispute today?
A. Occasionally. Maybe once or twice a month I'd see Marvin ride his little scooter down through there.
Q. You say little scooter. Is that like a farm -- was he doing some farming or something?
A. It was a little moped.
Q. And that was Marvin McClure that you --
A. Yes.
Q. -- saw do that? All right.

***

Q. Did you ever see any of his guests or anyone else that perhaps were related to him that would drive over this area?
A. No, sir.
Q. Now, you knew, though, that he and his family they were using this lake property, weren't they?
A. Yes, sir.
Q. Well, did you have any ideas of how they were accessing the lake property?
A. They were accessing it off of Patterson Lane. A gate opens to their property. It's about 53 footsteps from the gate that we use.

Defendant Shirley Carroll testified to her knowledge about the Holt family's use of the road:

Q. And you've heard a lot of testimony today about Mr. McClure and his use of that property. Did you ever observe Mr. McClure using the area that's in dispute today?
A. Occasionally, yes.
Q. When you say occasionally, how often would you see him using that?
A. Maybe once a month. It would be hard to remember, but he had to come right in front of my house.
Q. Do you recall what he was doing? Was it for farming? Do you know -- I mean, did you observe what he was doing when he would come that way?
A. No. No.
Q. Did you ever observe anyone else that would be his children or his wife or anyone else related to him coming that way?
A. I do remember that they did have the church over there from time to time.

-6-

Q. When you say from time to time, how often did that happen?

A. Well, maybe once a month. I really don't remember.

Q. Do you recall was it more seasonal as though it occurred in the summertime?

A. Oh, yes, I'm sure. I'm sure, because there would probably be outside activities and, you know - - yes. I do recall them using it for that, yes.

Q. Do you recall the last time that you ever saw Marvin McClure use that area, the area that's in dispute?

A. No, I don't.

Q. Would it have been -- he died. Do you recall when he died?

A. (The witness makes no audible response.)

Q. I believe we had testimony today it was in the late '90s that he passed away.

A. (Witness nodding head up and down.)

Q. Since that time have you ever seen anyone else use the area that's in dispute?

A. They would probably go over there, but they didn't camp or anything like that. I don't recall.

Q. Who is they?

A. Maybe Martha and Willis and maybe Roger. I didn't pay that much attention because they drove right in front of my house and went over there.

Q. And, of course, they had access to and a gate off of Patterson Road, which was down from your house here, didn't they?

A. Yes. That's how Martha and them would go in with the church people. They would go there and park in that meadow, as we used to call it, and, I guess, then go up toward the cabin. But that's the way they went in. I don't recall that much traffic going out on that little road. I really don't.

Regarding Holt's public road theory, testimony reflected that a culvert was placed on the Disputed Road Bed. Old tax maps also included the Disputed Road Bed. Stanley Thompson, property assessor for Bradley County, testified that the tax maps were inconclusive on the issue.

Q. Because a roadway is shown on the tax map, does that necessarily mean that it is a county road?

A. No.

Q. And so it is possible for a road to be depicted and it not be a county road and be a private road?

A. Correct.

Q. All right. Did you have an opportunity to go back and look at your tax assessment records with regards to Patterson Road?

A. Yes.

Q. Did you find anything in those records to indicate that at any time that Bradley County showed for assessment purposes that Patterson Road went straight as it shows here on this Exhibit 4?

A. Just from these original tax maps it shows that that road went through. Now, whether it was a county road or not, I couldn't tell you.

In August 2016, the Trial Court entered its final judgment dismissing Holt's complaint. In September, the Trial Court entered an agreed order amending its final judgment so as to attach a transcript of the Trial Court's ruling from the bench. The Trial Court stated as follows:

> I'm going to address each of the three theories individually.
>
> As far as it being a public road is concerned, I think that the law is, under the *McKinney* and *Duncan* case, and requoted in the *Lay* versus *Wallace* case, that to establish a dedicated road by implication, and I think we all know or I can certainly say that this was never a dedicated public road where the county accepted the public road, so the question is was it impliedly dedicated.
>
> From Stanley Thompson, the original tax maps were created by a flyover where somebody flew over the county in the 1960s with the equipment that was available back then and took pictures of the county and then they attempted to place property lines on the county tax maps in a way to be able to tax the property.
>
> Neither one of those creates ownership or takes away ownership of property, but that's the county's way of trying to be sure that they've got all of their property in the tax system and that it's all paying its appropriate share of taxes.
>
> There's no proof that the county worked this road. There's talk of a culvert, but no proof on who did it. To establish a dedication of a road by implication there must be proof of facts positively and unequivocally it appears that the owner intended to permanently part with their property and vest it in the public. There is not proof that the owners of the property intended to vest this area in orange into the public and there's no proof that the public accepted that road as a public road. There's no proof the county maintained the area.
>
> There is proof that it was a driveway for the benefit of the property owner and the defendants' predecessors in title. But there's no proof that the public used this road; that anybody who used this area, whether it's called a driveway or a road, was using it with the plaintiff's permission and the plaintiff didn't necessarily have the right to give that permission. But

the landowner in this case there's no proof opened this road to the public or acquiesced in the use of this being a public or intended to vest it as a public for an extended period of time.

So, as far as the public road theory of this case, this road is not on the current list for roads, it's not been consistently maintained, it was never a throughway, and the Court finds that it was not a public road.

The next question is whether this road was acquired as an easement by necessity. The expert in this case, Mr. Brown, said it's not necessary for that area to be opened as an access by the plaintiff in this case, that they have access directly off Patterson Road at their own gate.

In fact, when Mr. Brown went out there and when the parties went out there with their attorneys they all accessed this property through a gate and parked on this property as they walked this property. And now the cabin is accessible over on that part where the dam has failed, or at least allowed the lake to be drawn down, whether it's by this drought that we've been experiencing, as what Mr. Brown said, or because the dam hasn't been properly maintained -- Mr. Brown said it wasn't even properly built -- that the cabin is now accessible.

And I will note that the lake was created by the landowner. So, for the landowner to claim that now he has a necessity by something that he created, which was the lake, the -- and I can't see that far away, my contacts aren't working. I think that's 19.04; is that correct?

MR. CHANCEY: Yes, your Honor.

MR. HENRY: Yes, your Honor.

THE COURT: That the parcel 19.04 and the parcel of property south to it and Ms. Miolen's property were all owned by Mr. McClure and continue to be owned by the same family, or descendants of Mr. McClure.

So, I don't find that necessity has been proven as in there is no other ingress or egress there. The question is also, it's just whether they want to -- whether this is a convenience or not, whether the area on the south side of the lake is more convenient for them.

Also, one of the parties testified that the campers were pulled in an area over the dam or across the dam; and Mr. Miolen was able to access this property with his lawnmower, according to his wife. So, I don't find that there was an easement by necessity.

Now, the third theory that has been proffered by the defendants -- and not every witness in this case even testified that they got to that piece of property through the orange area. Several witnesses testified that they were out there and that they stayed out there. I don't find that they meant that they lived out there for months at a time, particularly when there was no plumbing out there. Finally, on some cross Mr. James, I believe his last

name was Hutchinson, said, well, he did go home and take showers, and that certainly makes better sense, but for witnesses to say they stayed out there all summer I don't find that that was necessarily credible. There is some electricity but certainly no plumbing out there.

For the parties to invite people to go in and out to their lake, I think that they did that; that there were several people out there from the 1960s at least through the late '70s. There wasn't a lot of testimony about the '80s, and certainly as far as the late '90s any use of the orange area has not been there.

So, in order to get a prescriptive easement under Tennessee law, the party seeking to establish that, which would be Mr. Holt, must demonstrate all of the elements by clear and convincing evidence. That doesn't mean a preponderance of the evidence. Clear and convincing evidence must meet a higher burden and eliminate any serious or substantial doubt about the correctness of the conclusions.

It is important to note that several witnesses said they were on the land; they didn't all say how they got to the land. The defendants in this case testified they would see people drive down Patterson Lane and use their gate, which was the gate on the McClure property up at the other end. And so if they assumed that they were using that gate and not traversing on their property, then there doesn't seem to be a claim that they were doing anything over there adversely.

The exclusive use of this orange area isn't there. The orange area was testified was a driveway for the house that was there, so the plaintiff in this case did not use it exclusively. It has been interrupted since at least 1999. It has not been continuous. The Holt and McClure family never claimed they had a right to do that until recently. It says under a claim of right and it must be adverse. In other words, it must be this is our land and not your land, and that's not what was going on here. If the owners acquiesce, if the Cantrells acquiesce to their use, that's not this adverse possession to the point where you get a prescriptive easement.

Mostly the land was used in the summertime, sometimes at New Year's. It was seasonal. Sometimes they had hayrides. They had church groups down there. It was not a continual residence and it wasn't used exclusively to the exclusion of others -- and that's what exclusive means, to the exclusion of others -- since the Johnson family was using that area down there.

So, as far as the three theories given to me today, I will look at those theories and the evidence that I have and find that the plaintiff has not established by clear and convincing evidence that they are entitled to go

-10-

across the Cantrell property to access theirs and I will dismiss their case. All right?

MR. HENRY: Cost?

THE COURT: Cost taxed to the plaintiff.

Holt appeals to this Court.

## Discussion

Although not stated exactly as such, Holt raises the following three issues on appeal: 1) whether Holt is entitled to a prescriptive easement across the Disputed Road Bed; 2) whether Holt is entitled to an easement by necessity across the Disputed Road Bed; and, 3) whether the Disputed Road Bed is a public road by implication.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

As our Supreme Court has instructed:

When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

We first address whether Holt is entitled to a prescriptive easement across the Disputed Road Bed. This Court has discussed prescriptive easements as follows:

-11-

"An easement is an interest in another's real property that confers on the easement's holder an enforceable right to use that real property for a specific use." *Vineyard v. Betty* No. M2001-00642-COA-R3-CV, 2002 WL 772870, at *2 (Tenn. Ct. App. Apr. 30, 2002) (citing *Bradley v. McLeod*, 984 S.W.2d 929, 934 (Tenn. Ct. App. 1998)). Appellants claim such an interest in a portion of the Bucse property under a theory of prescriptive easement. "Generally, [a prescriptive] easement arises when a use ... is adverse rather than permissive, open and notorious, continuous and without interruption, and for the requisite period of prescription." *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 378 (Tenn. 2007) (citing Ralph E. Boyer, *Survey of the Law of Property* 569-70 (3d ed.1981)). "The extent of the rights matured by prescription is based upon the extent of the use during the period of prescription." *Id*. "In order to establish prescriptive easement under the common law ..., the usage must be adverse, under claim of right, continuous, uninterrupted, open, visible, exclusive, and with the knowledge and acquiescence of the owner of the servient tenement, and must continue for the full [twenty years]." *Id*. at 379 (Tenn. 2007) (citing *Bradley*, 984 S.W.2d at 934); *see also Pevear v. Hunt*, 924 S.W.2d 114, 116 (Tenn. Ct. App. 1996); *House v. Close*, 48 Tenn. App. 341, 346 S.W.2d 445, 447 (Tenn. Ct. App. 1961). "A party claiming a prescriptive easement bears the burden of proving each element through clear and convincing evidence." *Hager v. George*, No. M2013-02049-COA-R3-CV, 2014 WL 3371680, at *3 (Tenn. Ct. App. July 8, 2014) (citing *Stone v. Brickey*, 70 S.W.3d 82, 86 (Tenn. Ct. App. 2001)). "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 128 (Tenn. 2013) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). "The evidence must create a high probability of the truth of the facts asserted, leaving the moving party with a heavy burden and a high bar for obtaining relief." *Hager*, 2014 WL 3371680, at *3 (Tenn. Ct. App. July 8, 2014) (citing *Furlough*, 397 S.W.3d at 128).

*The River Oaks, GP v. Bucse*, No. M2015-02208-COA-R3-CV, 2016 WL 6248024, at *4 (Tenn. Ct. App. Oct. 25, 2016), *no appl. perm. appeal filed*.

In this case, Holt, as the claimant, holds the burden of proving each element of a prescriptive easement by clear and convincing evidence. This case hinges, in significant part, upon credibility determinations of the witnesses. We are obliged by longstanding Tennessee case law to defer heavily to trial courts' witness credibility determinations. The Trial Court found that Holt and his guests used the lake property merely in a

seasonal, occasional manner. The Trial Court specifically found non-credible the testimony that anyone "lived" by the lake for any extended period of time. More to the point, the Trial Court found the evidence murky as to whether guests used the Disputed Road Bed or the upper gate to access the property.

Our review of the trial testimony supports this conclusion. If dozens of guests flooded the lake property each day from 1964 through 2012, but only one guest used the Disputed Road Bed once per decade while the rest used the upper gate, this would not constitute the kind of continuous, adverse use contemplated by law. Even if we grant from the testimony that on some occasions some guests used the Disputed Road Bed, we find, as did the Trial Court, that this occasional use does not rise to the level of continuous use of the Disputed Road Bed, even in light of Holt's property's particular context as an outdoor recreational site.

The evidence does not preponderate against the Trial Court's factual findings, nor does clear and convincing evidence exist such as to overturn the Trial Court's implicit and explicit credibility determinations. Given this, we find that Holt failed to prove the essential element of continuous use of the Disputed Road Bed by the standard of clear and convincing evidence. We affirm the Trial Court as to this issue.

We next address whether Holt is entitled to an easement by necessity across the Disputed Road Bed. Regarding easements by necessity, we have stated:

> In order to find the creation of an easement by necessity, Shelby County and MLGW must show the following:
>
> > The prerequisites to the creation of an easement by necessity are: 1) the titles to the two tracts in question must have been held by one person; 2) the unity of title must have been severed by a conveyance of one of the tracts; 3) the easement must be necessary in order for the owner of the dominant tenement to use his land with the necessity existing both at the time of the severance of title and the time of exercise of the easement.
>
> *Powell v. Miller*, 30 Ark.App. 157, 785 S.W.2d 37, 39 (1990) (citing *Burdess v. United States*, 553 F.Supp. 646, 649-50 (E.D. Ark. 1982)); *see also Morris v. Simmons*, 909 S.W.2d 441, 444 (Tenn. Ct. App. 1993). The first and second elements are satisfied in this case since the parcel now owned by Shelby County originated by deed from a larger tract previously owned by Stonebridge.

-13-

The third element, regarding necessity, arises when the conveyance results in the dominant parcel becoming landlocked. 28A C.J.S. *Easements* § 93 (1996); *see also Thompson v. Hulse*, No. E1999-02474-COA-R3-CV, 2000 WL 124787, at \*5, 2000 Tenn.App. LEXIS 31, at \*15-16 (Tenn. Ct. App. Jan. 26, 2000); *Morris v. Simmons*, 909 S.W.2d 441, 444 (Tenn. Ct. App. 1993); *Whitwell v. White*, 529 S.W.2d 228, 232 (Tenn. Ct. App. 1974).

*Cellco Partnership v. Shelby County*, 172 S.W.3d 574, 592 (Tenn. Ct. App. 2005).

Regarding the definition of necessity, we have stated:

Although Tennessee does not require "strict necessity," the degree of necessity must be more than "mere convenience." *Id*. (citations omitted). Where the claimant has another reasonable or practicable mode of ingress and egress, this Court will not imply a way of necessity. *Id*. at 593 (citing 28A C.J.S. Easements § 97 (1996)). Where the party claiming the right can, at reasonable cost, create a substitute on his own estate the easement is not necessary. *Line v. Miller*, 43 Tenn.App. 349, 351, 309 S.W.2d 376 (1957).

*Newman v. Woodard*, 288 S.W.3d 862, 868 (Tenn. Ct. App. 2008).

The Trial Court found: "The expert in this case, Mr. Brown, said it's not necessary for that area to be opened as an access by the plaintiff in this case, that they have access directly off Patterson Road at their own gate." Brown testified that he believed he "could get a driveway there or a road." Holt's lake property is not landlocked and is directly accessible via the upper gate without entering anyone else's property. There was considerable testimony as to the harshness of the terrain and topography. However, there was insufficient evidence to establish that Holt lacked any reasonable alternative, such as having a road built, to an easement in order to access the more remote parts of his property. As did the Trial Court, we also have some difficulty with Holt's predecessor having created the lake on the property and then Holt arguing that this lake created by his predecessor makes a portion of his property inaccessible without an easement over the Disputed Road Bed. To the extent any necessity exists, it was the creation of the lake and not any conveyance of property that created the necessity.

Apart from the lack of necessity, we note additionally that Holt never established the unity of title element necessary for the creation of an easement by necessity. In fact, Holt never discusses the unity of title requirement in the section of his brief discussing easement by necessity. We affirm the Trial Court on this issue.

-14-

We next address whether the Disputed Road Bed is a public road by implication. Regarding public roads by implication, we have stated:

> To establish a public road by implication, the proponent must satisfy two requirements. First, the landowner must intend to dedicate the road to the public. *McCord v. Hays*, 202 Tenn. 46, 302 S.W.2d 331, 333 (Tenn. 1957). Second, the public must expressly or impliedly accept the road. *Id*. The burden of proof is heavy. In short, the proponent must present
>
>> proof of facts from which it positively and unequivocally appears that the owner intended to permanently part with his property and vest it in the public, and that there can be no other reasonable explanation of his conduct. In other words, dedication is a question of intention, and the intent must be clearly and satisfactorily proven.
>
> *McKinney v. Duncan*, 121 Tenn. 265, 118 S.W. 683, 684 (Tenn.1909).

*Gore v. Stout*, No. M2006-02111-COA-R3-CV, 2008 WL 450597, at *4 (Tenn. Ct. App. Feb. 19, 2008), *no appl. perm. appeal filed*.

The standard on public roads by implication is quite high. We find nothing approaching unequivocal evidence in the record on appeal that the Cantrells ever intended to dedicate the Disputed Road Bed to the public. Likewise, neither is there proof that the public accepted the Disputed Road Bed as a public road. We affirm the judgment of the Trial Court as to each of the three theories advanced by Holt.

As a final matter, Defendants attempt, in the body of their brief on appeal, to raise the issue of whether this appeal is frivolous even though they do not set it out in their statement of the issues as required. In any event, while unsuccessful, the issues raised by Holt are not utterly devoid of merit. We decline to find this appeal frivolous.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Roger L. Holt, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE