IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 5, 2017 Session

## MICHAEL O'BRIAN, ET AL. v. RUTHERFORD COUNTY BOARD OF EDUCATION

**Appeal from the Circuit Court for Rutherford County**
**No. 105C-CV        Mitchell Keith Siskin, Judge**

_____

### No. M2017-00527-COA-R3-CV

_____

This action arises out of an incident in which an instructor with the Eagleville High School's Junior Reserve Officer Training Corps pulled a stool from beneath a student participant in a JROTC competition while the student was sitting on it, causing injury to the student. The student's parents brought suit against the Rutherford County Board of Education under the Tennessee Governmental Tort Liability Act to recover for her injuries. Following a trial, the court dismissed the suit, holding that the instructor's actions were not within the scope of his employment, and therefore, the Board's immunity from suit was not removed. Plaintiffs appeal. We conclude that the evidence does not preponderate against the trial court's holding that the instructor acted outside the scope of his employment, and as a consequence, the Board retained immunity from suit. Accordingly, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Rutherford County Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Brandon Bass, Brentwood, Tennessee, for the appellants, Michael O'Brian and Janet O'Brian.

Josh A. McCreary, Murfreesboro, Tennessee, for the appellee, the Rutherford County Board of Education.

### OPINION

Caitlyn O'Brian was a 15-year-old sophomore at Eagleville High School in Rutherford County, where she was a member of the Junior Reserve Officer Training Corps ("JROTC"). Robert Kunkel was the Senior Army Instructor in charge of the

Eagleville High School JROTC program, coach of the team in competitions, and an employee of the Rutherford County Board of Education. On September 28, 2013, Ms. O'Brian participated in a JROTC competition at another high school, with Mr. Kunkel as her instructor. Mr. Kunkel directed the team to sit on a log near a folding stool he had brought from home for his personal use during the competition. When Ms. O'Brian arrived at the spot where her team was meeting, she sat on Mr. Kunkel's stool instead of sitting on the log with the rest of the team. Mr. Kunkel arrived at the meeting spot while Ms. O'Brian was sitting on the stool, tying her boots; he told Ms. O'Brian to sit on the log with her teammates; she refused. Mr. Kunkel instructed her to move a second time, and she again refused, at which time Kunkel pulled the stool out from under Ms. O'Brian while she was sitting on it, causing her to fall in the grass and land on her tailbone. Ms. O'Brian completed the competition but sought medical treatment several days later.

Ms. O'Brian's parents filed suit against the Rutherford County Board of Education ("the Board"), alleging that Ms. O'Brian was injured as a direct and proximate cause of Mr. Kunkel's actions; that Ms. O'Brian has endured and will continue to endure pain and suffering, permanent impairment, and loss of enjoyment of life; and that Rutherford County Board of Education was liable under the doctrine of *respondeat superior*.

In due course, a non-jury trial was held, during which the trial court heard testimony from Ms. O'Brian and Angel McCloud, the Board's staff attorney; the depositions of Mr. Kunkel and David West, Ms. O'Brian's orthopedic surgeon, were entered into evidence. At the conclusion of the proof, the court took the matter under advisement and subsequently issued its findings of fact and conclusions of law, finding that "Mr. Kunkel's reaction to the situation was so extraordinary that it could not be deemed to be within the scope of his employment." The court held that the Board retained its immunity and dismissed the complaint.

Plaintiffs appeal, stating the following question for our review: "[w]as the appellee school board's employee acting in the scope of employment when he attempted to 'coax' a student to stand up from a chair by moving the chair while the student was seated?"

## DISCUSSION

Tennessee Code Annotated section 29-20-201, a part of the Tennessee Governmental Tort Liability Act ("GTLA"), grants immunity from suit to all governmental entities "for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise of any of their functions." Section 29-20-205 removes the immunity for injuries proximately caused by the negligent act or omission of a governmental employee acting within the scope of their employment; there are several exceptions to the removal of immunity at section 29-20-205, none of which are at issue in this case.

2

In our resolution of this appeal, we must determine whether Mr. Kunkel was acting within the scope of his employment when he pulled the stool from under Ms. O'Brian. Whether an employee is acting within the scope of employment within the meaning of the GTLA is a question of fact; it becomes a question of law when the facts are undisputed and cannot support conflicting conclusions. *Hughes v. Metropolitan Government of Nashville and Davidson County*, 340 S.W.3d 352, 361 (Tenn. 2011). We review the trial court's findings of fact *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

Our Supreme Court provided guidance on how to determine whether an employee acted within the scope of his or her employment in *Hughes v. Metropolitan Government of Nashville and Davidson County*. In that case, a Metro Public Works Department employee was returning his front-end loader to a Public Works facility at the end of the day when he revved the engine and dropped a bucket of the loader to the pavement, making a loud scraping noise. *Id.* at 355. The noise startled a Fire Department employee, who was walking with his back to the loader, and caused him to jump awkwardly over a guardrail to get out of the way. *Id*. The fall caused the Fire Department employee injuries, which resulted in rotator cuff surgery and a double knee replacement. *Id*. The injured employee filed suit against the employee driving the loader and the Metropolitan Government of Nashville and Davidson County under the GTLA. *Id*. After a trial, the trial court determined the Public Works employee was acting within the scope of his employment, entered a judgment for the plaintiffs against the governmental entity, and the Court of Appeals affirmed. *Id*. at 358-59.

On further appeal, our Supreme Court applied sections 228 and 229(2) of the Restatement (Second) of Agency, which it opined provides a "more instructive framework for an analysis [of whether an act was within the scope of employment] that is ultimately 'dependent upon the facts of the particular case.'" *Id.* at 365 (quoting Restatement (Second) of Agency § 229 cmt. a).[1] The Supreme Court determined that the

---

[1] The factors at Restatement (Second) of Agency section 228 are:

(1) Conduct of the servant is within the scope of employment if, but only if:
    (a) it is of the kind he is employed to perform;
    (b) it occurs substantially within the authorized time and space limits;
    (c) it is actuated, at least in part, by a purpose to serve the master; and
    (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
(2) Conduct of the servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

Those at section 229(2) are:

3

evidence that the employee was hired to operate heavy equipment and, as instructed by his employer, was returning the loader at the end of the work day implicated the factors at section 228(1)(a), (b), and (c) of the Restatement; the Court held that "the [employee's] acts were 'actuated, at least in part, by a purpose to serve' Metro, . . . in that his misguided use of the front-end loader was largely bound up in his duties as a Metro employee, as opposed to a purpose that was 'purely personal.'" *Id.* at 366 (citation omitted). The court also noted that "[b]y driving the front-end loader so as to make a loud noise, he was neither 'far beyond' the time and place of his employment or too far removed from his regular duties, factors suggesting his actions could be attributable to Metro." *Id.* at 367 (citing Restatement (Second) of Agency § 228(2)).

With respect to the factors found at section 229(2) of the Restatement (Second) of Agency, the court opined that the evidence supported the trial court's determination that the defendant was acting within the scope of his employment due to the proof that it was common for the defendant to return the front-end loader every day, § 229(2)(a); the incident occurred during working hours on the access road leading to the Metro facility § 229(2)(b); the incident took place while the defendant was driving the front-end loader Metro provided, § 229(2)(h); the defendant's "manner of driving did not *extensively* depart from the normal method of returning the front-end loader," § 229(2)(i); and defendant's use of the front-end loader was not "seriously criminal," § 229(2)(j). *Hughes*, 340 S.W.3d at 367 (emphasis in original).

Ultimately, the Supreme Court held that the evidence did not preponderate against the trial court's finding that the Defendant was acting within the scope of his employment, reasoning that "there [wa]s no evidence that the Defendant made such a

---

(2) In determining whether or not the conduct although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
    (a) whether or not the act is one commonly done by such servants;
    (b) the time, place and purpose of the act;
    (c) the previous relations between the master and the servant;
    (d) the extent to which the business of the master is apportioned between different servants;
    (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
    (f) whether or not the master has reason to expect such an act will be done;
    (g) the similarity in quality of the act done to the act authorized;
    (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
    (i) the extent of departure from the normal method of accomplishing an authorized result; and
    (j) whether or not the act is seriously criminal.

4

departure from his duties as a Metro employee that his acts, as a whole, could be considered a venture of a 'purely personal' nature." *Id*. at 367.

In this case, the only evidence introduced at trial relevant to the issue of scope of employment was introduced through the deposition of Mr. Kunkel and the testimony of Ms. McCloud. Pertinent to this issue, Mr. Kunkel testified that he was a Senior Army Instructor and reported to Colonel Houchens, Director of Army Instruction, who was in "overall command" of all the schools in Rutherford County. Mr. Kunkel testified that he performed administrative, educational, and training duties. While testifying about the incident he said, "And anyone that knows, with ROTC and JROTC, we try and push the discipline piece as much as possible. Respect and discipline." Mr. Kunkel was also asked whether he felt like getting Ms. O'Brian off the chair was part of his responsibility as the ROTC director or if he was just concerned because it was his personal chair. Mr. Kunkel answered:

> I -- I didn't care that it was my personal chair. It was more so -- again, it goes back to the good order and discipline of what I was asked to do as an Army JROTC instructor. That I -- I needed to get her doing what I needed her to do, which was sit on the log with the rest of her teammates.

Mr. Kunkel said his actions in pulling the stool from beneath Ms. O'Brian occurred "in the heat of the moment" and out of "frustration" because Ms. O'Brian was disrespecting him; that, in his opinion, his action was not within the scope of his employment; that he did not report the incident within the week that it occurred, but reported it when he found out Ms. O'Brian had injured her back; that he was not disciplined in any way for the events of the day; and that his departure from Eagleville High School had nothing to do with the incident.

Ms. McCloud's testimony on this issue was as follows:

> Q Are there training materials on policies that would relate to conduct of coaches and individuals like Mr. Kunkel?
> A Yes.
> Q In terms of what you have heard, was the -- were the actions of Mr. Kunkel inside or outside the scope of the policies and procedures for the Rutherford County Board of Education?
> A Outside.
> Q Is there anything in the procedures and training that you're involved with that deal with how to address a student who is being belligerent or not obeying?
> A Yes.
> Q Okay. And do any of those suggested policies, procedures or training include moving a chair or forcing a student out of a chair?

5

A No.

Q Inside the training and so forth that you have described, are there methods presented in there of how to appropriately deal with these kinds of circumstances?

A Yes.

Q Have you ever coached a teacher or coach to deal with the student in a way Mr. Kunkel apparently did?

A No.

Q Are you aware of anyone at the Board of Education who has counseled a teacher or a coach to deal with a student the way Mr. Kunkel apparently did?

A No.

Q Assuming Mr. Kunkel did act in the way he described in his deposition, was he acting within the scope of his employment?

A No.

. . .

Q So, in your view, Mr. Kunkel was acting outside the bounds of his authority when he pulled on this chair; is that correct?

A Yes.

Q When did you fire him for it?

A I'm sorry?

Q Then when did you fire him for it?

A We did not.

Q How long did you suspend him for it?

A We did not.

Q How long did you put him on probation?

A We did not.

Q What disciplinary marks did you put in his personnel file?

A None that I'm aware of.

Q Did you view this as criminal conduct somehow?

A No.

Q Did you report it to anyone?

A I did.

Q Who did you report it to?

A The director of schools.

Q Did you report it to the police?

A I'm sorry?

Q Did you report it to the police?

A I did not report it to the police.

Q Are you aware of anyone from the board reporting it to the police?

A I do believe that the school personnel reported it to the SRO.

Q Okay. You develop the policies – you're familiar with the policies as

6

they exist, including those that were drafted before you came on 12 years ago as staff attorney for the school board, correct?

A Correct.

Q Those include corporal punishment, correct?

A Correct.

Q Do you have a specific policy addressing corporal punishment as it should be applied to students in certain limited circumstances, correct?

A We do.

Q And part of Mr. Kunkel's job description included maintaining the presence in the classroom and outside training areas to ensure the maintenance of discipline and continual safety of cadets, correct?

A Correct.

The Board policies to which Ms. McCloud referred were not introduced into evidence.

Relative to the circumstances of the incident, Mr. Kunkel testified:

I recall that we had finished the PT portion of the test and that we were given 20 or 30 minutes for the next event, before the next event started, which was the rope bridge, I believe. And that everyone was told to get dressed in their uniform, and it was—it was kind of a—you just put 'em on over your shorts and over your shirt; you didn't have time to go to the bathrooms and things like that; you just got dressed. And I had asked all the cadets to gather on a log, I think it was. And all the cadets gathered on the log, and I was facing them, like I am now. And Caitlyn O'Brian was behind me sitting on my stool, and it's a stool that's—stands about that far off the ground. And I told her to come around and sit on the log with everyone else, and she said something to the effect of, "No I'm tying my shoes." And I waited a few more seconds, and then I said, "Ms. O'Brian,"—because they asked us to try and treat them a little more professionally; I didn't call all of 'em cadet all the time; it was "Mr." or "Ms." I said, "Ms. O'Brian, please come and sit on the log," so that I can brief the team up on what we were doing. Again, we only had a few minutes to do that. And she said, "I'm almost finished, man." . . . And I said—I paused for a second; I said, "I need you to come and sit on the log now." And she once again said, "Man, I'm almost done." And that's when I—I can't recall if I grabbed it, if I tipped it or hit the edge of the chair, and she fell about four inches, maybe down to the very tall grass that the stool was in.

This testimony implicates Restatement (Second) of Agency sections 228 (b) and (c), inasmuch as the incident occurred in the course of a school-sanctioned JROTC competition at another high school, and Mr. Kunkel's action in removing the stool from beneath Ms. O'Brian was motivated in part by his desire to maintain "the good order and

7

discipline of what I was asked to do as an Army JROTC instructor" and that he "needed to get her doing what I needed her to do, which was sit on the log with the rest of her teammates."

Similarly, the testimony implicates Restatement (Second) of Agency section 229(2)(a), (b), (f), (g), (h), (i), and (j); of these, factors (a), (f), and (h) clearly weigh against concluding that Mr. Kunkel was acting within the scope of his employment.[2] Mr. Kunkel's behavior occurred during a JROTC competition in his role as disciplinarian over the team, section 229(2)(b); Ms. McCloud testified that she did not view his actions as criminal conduct, section 229(2)(j). Section 229(2)(g) requires the court to consider "the similarity in quality of the act done to the act authorized" and section 229(2)(i) requires the court to consider "the extent of departure from the normal method of accomplishing an authorized result." Factors (g) and (i) are matters that are dependent upon an examination of the Board's policies and procedures. Because the policies and procedures were not introduced into evidence, however, we are unable to assess the extent to which Mr. Kunkel's actions in dealing with the disruptive student were similar to those authorized or the extent to which they departed from the policies and procedures. In this regard, we also note that both Mr. Kunkel and Ms. McCloud testified that Mr. Kunkel acted outside the scope of his employment.

As noted earlier, the question of whether an employee is acting in the scope of employment within the meaning of the GTLA is a question of fact. *Hughes*, 340 S.W.3d at 361. The evidence before us does not preponderate against the trial court's determination that Mr. Kunkel's actions were not in the scope of his employment and, consequently, the Board's immunity was not removed under Tennessee Code Annotated section 29-20-205.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

_____
RICHARD H. DINKINS, JUDGE

---

[2] Ms. McCloud testified that pulling a stool from under a student was not authorized under Board policy, and Mr. Kunkel testified that the Board "wouldn't have anticipated that that would have been the method you would use [to get Ms. O'Brian off the stool]," section 229(2)(a); Mr. Kunkel testified that his action came about "in the heat of the moment" and out of "frustration," section 229(2)(f); and the stool was Mr. Kunkel's personal property rather by being furnished by the Board, section 229(2)(h).